137 F.2d 803 (1943)
UNITED STATES GYPSUM CO.
v.
BROWN, Price Adm'r.
No. 29.
United States Emergency Court of Appeals.
Argued June 16, 1943.
Decided August 19, 1943.
Rehearing Denied October 6, 1943.
*804 Charles M. Price, of Chicago, Ill. (Robert A. Sprecher, of Chicago, Ill., on the brief), for complainant.
Nathaniel L. Nathanson, Asst. Gen. Counsel, and John O. Honnold, Jr., Atty., both of Office of Price Administration, both of Washington, D. C. (George J. Burke, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, and James A. Durham, Atty., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
LAWS, Judge.
This appeal involves a construction of regulations issued by the Price Administrator pursuant to the Emergency Price Control Act of 1942,[1] namely, General Maximum Price Regulation,[2] issued April 28, 1942, and Maximum Price Regulation No. 188,[3] issued July 29, 1942. By these Regulations, maximum prices for sales of commodities were established at the highest prices charged purchasers during March, 1942. As applied to this case, the Regulations fix the maximum prices at which complainant and others may sell gypsum products in a region of the United States referred to as the "Philadelphia Area", which includes eastern Pennsylvania, the southern half of New Jersey, and all of Delaware, Maryland and the District of Columbia.
Complainant is a manufacturer of gypsum products, principally wall plasters, wall boards, laths and sheathing boards, used in construction of buildings. These products are manufactured from crude gypsum rock. In the eastern part of the United States crude gypsum rock is found commercially in western New York State, between Buffalo and Rochester, and in southwestern Virginia around Saltville. Complainant and other members of the industry established manufacturing plants near these sources of supply, complainant's plants being *805 at Oakfield, New York, and at Plasterco, Virginia. Those in the industry also have established seaboard plants to which crude gypsum rock found in eastern Canada might be shipped by water at low transportation cost. Complainant established seaboard plants at Boston, New Brighton (on Staten Island, New York), Philadelphia and Jacksonville. Its competitors established plants near those of complainant at Oakfield and Plasterco, and also established plants at Akron, Harlem River, Clarence Centers and Wheatland, all in New York State, and South Kearny, New Jersey. No plants of competitors were established at Philadelphia or within the Philadelphia Area.
In the sale and distribution of its products, complainants for many years engaged in the practice of having each of its plants serve a definite marketing territory surrounding it. Thus its Philadelphia plant usually supplied the Philadelphia Area. Also in pricing their products the practice of complainant and others in the industry was to sell f. o. b. plant of shipment, the purchaser paying freight to point of destination. However, this practice of pricing was subject to exceptions in some cases. In order to meet competition, a seller would lower his plant charges so as to allow for the difference between the freight charges from his plant and the lesser freight charges the purchaser would have to pay when the competitor's supplying plant was nearer to the point of delivery. In the trade this practice is referred to as "freight equalization". It assured the purchaser of the same delivered cost of products, regardless of the distance the product was transported. Another exception occurred when all purchasers in specified zones were sold products at uniform delivered prices, making the net cost of the product the same to all purchasers for delivery within that zone. A third exception occurred when the seller made shipment from one of its more distant plants to accommodate one of its plants situated nearer to the point of destination. In these cases, the delivered charges for the product were the same as if shipment were made from the nearer plant.
During March, 1942, complainant's Philadelphia plant was in operation. Its prices generally charged for sales in the Philadelphia Area were f. o. b. the Philadelphia plant, except that it had established six zones within the metropolitan area of Philadelphia throughout which the delivered price was uniform. Complainant's competitors, in order to be able to make a delivered cost to purchasers in the Philadelphia Area comparable to the delivered cost to purchasers from complainant, followed the "freight equalization" practice by reducing their plant charges. When complainant found it necessary to make a shipment to customers in the Philadelphia Area from a plant other than its Philadelphia plant, it adjusted its charges so that the delivered price would be the same as if shipment were made from the Philadelphia plant.
In July, 1942, complainant's vessels which had transported crude gypsum rock from Nova Scotia to the Philadelphia plant were requisitioned by the Government. Because crude gypsum rock was not then available at low transportation rates, complainant closed its Philadelphia plant except for the manufacture of small quantities of products required to fill urgent war orders. When the closing of the Philadelphia plant occurred, announcement was made by complainant that gypsum products of the kind formerly manufactured and sold from the Philadelphia plant would be available from other plants of the company at f. o. b. plant prices of the producing plant. Complainant also announced that it would reduce its plant prices so as to meet delivered prices of its competitors, in accordance with the "equalizing freight" practice heretofore described, and that it would meet delivered prices of its own operating plants.
In the beginning, the method of pricing as announced by complainant met with the approval of the Administrator. On July 24, 1942, an Assistant General Counsel for the Administrator wrote a letter advising complainant that the General Maximum Price Regulation (then the only Regulation in effect) had been interpreted as permitting complainant to charge for products delivered in the Philadelphia Area the price of the product f. o. b. at complainant's mill from which the product was supplied. The result of this interpretation was that the delivered cost to purchasers in the Philadelphia Area would be in excess of the delivered cost paid during March, 1942, when the Philadelphia plant, much nearer to them, had supplied the products. On September 1, 1942, the Assistant General Counsel for the Administrator reversed this interpretation of the Regulations and advised complainant that prices for gypsum *806 products in the Philadelphia Area might not be charged above those which would "reflect to purchasers * * * the same net cost after discounts and freight charges as was in effect March, 1942." This interpretation of September 1, 1942, was protested to the Administrator and it was because of his denial of the protest that this complaint was filed.
Complainant originally contended that the Emergency Price Control Act of 1942 does not authorize the Administrator to fix a maximum price for a class of commodities unless the price of such class has either risen or threatened to rise and that since there had been no such rise or threatened rise of prices of gypsum products, the Regulations were invalid. During the pendency of this case this contention was abandoned, after being challenged as an attack upon the Regulations made after expiration of the time allowed by the Act. Complainant now contends that, granting the Administrator had the right to fix prices applicable to gypsum products, this right is limited by the Emergency Price Control Act to the rolling back of prices to normal levels or freezing them at normal levels. It submits that the effect of the present construction of existing Regulations is to require a reduction of prices to a point below normal levels.
Complainant's protest upon this ground was taken within the time fixed by the Act. Inasmuch as the Regulations as drawn did not indicate clearly how the maximum price levels of gypsum products would apply in the Philadelphia Area and since counsel for the Administrator first made an interpretation favorable to complainant, there was no cause for protest until the interpretation of September 1, 1942, the first ruling adverse to complainant. The right to protest to the Administrator and to file a complaint in this Court upon its denial, under the circumstances stated, is recognized by the decision of this Court in Galban Lobo Co. v. Henderson, Em.App., 132 F.2d 150, 152.
In dealing with the merits of complainant's contention, we do not find it necessary to decide the question as to whether or not the Administrator may issue a regulation which has the effect of a general reduction of prices below normal levels. The Regulations applicable to this case did not establish a general reduction of prices below normal levels, but in effect simply froze prices at levels which complainant and others in the industry previously had established in the Philadelphia Area. What were the levels which had been established? They were not the plant charges alone, because in a number of instances plant charges were arrived at by taking into account the freight charges the purchaser was required to pay. Thus while pricing in the industry was based in form on fixed charges f. o. b. plant, yet since those charges varied from time to time as freight charges varied on shipments from differently situated plants of competitors, the freight charges became an essential part of pricing and the normal level of pricing could not be definitely ascertained without reference to them.
It is true that from the present construction of the Regulations complainant suffers a reduction in its net return from sales in the Philadelphia Area. Except early in the year 1942, when there was a price increase to which the Price Administrator made no objection, there had been no increase, or threatened increase, since the year 1936 in plant prices of gypsum products at New Brighton, Oakfield and Plasterco, the plants from which complainant's products now sold for delivery in the Philadelphia Area will be shipped. If the Regulations as now interpreted will compel complainant to absorb freight charges from these points, which previously would not have had to be borne by it, complainant will suffer a reduction in income. However, this result does not offend the provisions of the Emergency Price Control Act.
The Act in Section 2(a) states that the maximum prices established must be such as in the judgment of the Administrator will be "generally fair and equitable and will effectuate the purposes of this Act." This language does not undertake to deal with hardships in individual cases. As we previously have said, in speaking of the provisions of the Act with regard to regulation of rents, "Some individual hardships are inescapable in a regulatory job of such magnitude, made necessary by the war emergency."[4] In referring to prices which will be "generally fair and equitable," the Act deals only with the general effect upon the over-all operations of those in the industry. This was pointed out by the Report of the Senate Committee on Banking *807 and Currency made with respect to the Price Control Bill when it was pending in Congress. In this Report the following was stated: "Because of the legislative nature of regulations establishing maximum prices, applying to large numbers of sellers, the bill does not guarantee a profit to each individual seller. It requires instead that such prices be generally fair and equitable as applied to the sellers responsible for the major part of the output of any commodity. As to such sellers it is the effect of the maximum price upon their over-all operations as business units that must be considered."[5]
There is no showing that the Regulations as interpreted are not "generally fair and equitable" to members of the industry. Under date of December 21, 1942, the Administrator offered complainant opportunity to adduce evidence to show any hardship to which it or any other member of the industry which was supplying products in the Philadelphia Area had been subjected by the maximum prices which had been fixed. Complainant offered none. So far as the record shows, complainant has suffered and in the future will suffer nothing more than a reduction in its profits. Its competitors within the Philadelphia Area have not been caused any reduction in either prices or income. When Congress committed to the Price Administrator the stupendous task of checking excessive price rises and inflationary tendencies in times of war, it obviously did not intend to limit the effectiveness of a broad program simply because an individual seller would suffer curtailment of its profits or income.
For the reasons stated, we find that the present construction by the Administrator of the Regulations applicable to this case does not constitute a reduction of prices in violation of the Emergency Price Control Act of 1942.
Complainant next contends that the construction now made of the Regulations violates Section 2(a) of the Emergency Price Control Act, which provides that: "As used in the foregoing provisions of this subsection, the term `regulation or order' means a regulation or order of general applicability and effect."
It is argued that since the interpretation of the Regulations in effect requires complainant to reduce its prices on gypsum products shipped from its New Brighton, Oakfield and Plasterco plants and does not require similar reductions with respect to other commodities and other sellers, the Regulations are not given general applicability and effect. The Act does not require that a regulation or order shall have the same effect upon the businesses of all in the industry. In any price control program, different effects will result in the affairs of different concerns. One may suffer no bad effects, another may suffer loss of part of its profits, another all of its profits, yet another may suffer over-all losses in its business. Apparently for this reason Section 2(c) of the Act makes it possible for the Administrator, if he finds it necessary or proper to carry out the purposes of the Act, to provide adjustments, exceptions, classifications, and differentiations in a regulation or order.
It appears to us that the Regulations in this case as they have been interpreted clearly constitute regulations of general applicability and effect. The maximum prices established for gypsum products delivered in the Philadelphia Area generally affect all sellers for delivery within that Area. The same formula, namely, the pricing based upon the delivered charges to purchasers in March, 1942, is applied to all sellers. The present and future effects upon individual sellers may differ. Complainant had the misfortune of finding it necessary to close its plant in the Philadelphia Area, with the result that since the Regulations require the same delivered cost as when the Philadelphia plant was in operation, the business of complainant will yield less net income. If a competitor of complainant suffered the same misfortune or some other event which required it to make shipments into the Philadelphia Area from a more distant mill than one from which it shipped during March, 1942, it would be governed by the same limitation which affects complainant and would suffer the same character of losses in its net income. At the present time the competitors of complainant who sell in the Philadelphia Area are limited by the Regulations in this case as construed by the Administrator. Upon the closing of complainant's Philadelphia plant, it became plainly to the interest of complainant's competitors, when selling in the Philadelphia Area, to decrease the part of the freight charge which they had been absorbing in equalizing with the Philadelphia plant's delivered prices. Previously *808 these adjustments were on the basis of greater concessions to purchasers than now are necessary to meet competition. In some instances no concessions now need to be made and, if the prices might be revised, the result would be a greater return of net income to the sellers and a greater delivered charge to the purchasers. However, these sellers may not make the revision. The Regulations which limit complainant likewise apply to and limit them.
If this Court were to enjoin the Administrator from enforcing his interpretation of existing Regulations as prayed by complainant, the result would be to violate the provision of the Price Control Act upon which complainant relies. If the injunction were granted as requested, complainant would be freed from the maximum delivered price established for its products in the Philadelphia Area, while its competitors would be held to the maximum delivered prices established for their products. Complainant thus would be able to sell its products shipped into the Philadelphia Area at higher delivered charges than its competitors. Complainant's f. o. b. plant price practice would be recognized, but the similar practices of its competitors would be denied. No interpretation of the Act may be made to justify such discrimination. The form of any injunction, if granted in this case, necessarily would be such as would free the competitors of complainant, as well as complainant, from the present construction of the Regulations, with the obvious result of a general upward trend of delivered prices in one section of the country. Plainly this would be contrary to the purposes of the Act.
Throughout their arguments, counsel for complainant have stressed the contention that the Regulations require changes in established business practices in the gypsum industry, in violation of Section 2(h) of the Act. They refer to what is claimed to be the established practice of pricing gypsum products f. o. b. shipping plant.
Section 2(h) reads as follows:
"The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, except to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act."
An analysis of the legislative history of this Section discloses that the Section was originally added to the Bill proposed by the House Committee on Banking and Currency, at the suggestion of advertising interests, which feared that the authority of the Administrator might be used to curtail advertising expenditures on the theory that they contributed to rising prices.[6] As consideration of the subject developed, the Section was altered in the House Bill to include "business practices or cost practices, means or aids to distribution (such as advertising)."[7] The Price Control Bill reported by the Senate Committee on Banking and Currency did not contain a similar section because, as stated by Senator Taft, a member of the Committee, "* * * it did not think the bill gave * * * the power to interfere with any such practices"[8] The Section was added to the Senate Bill on the floor of the Senate at the suggestion of Senator Vandenberg, who stated that it was "simply an effort to make sure that the authority granted in the bill does not permit the price controller to reach down into the business practice of an institution and undertake to revamp it."[9]
At another point, Senator Vandenberg stated that: "The sole purpose of the amendment, Mr. President, is to make sure that the bill is simply a price-control bill, and not a business management-control bill. * * *"[10]
The Congressional Record shows that Senator Brown, who sponsored the Bill through the United States Senate and who now is the Price Administrator, agreed with the interpretation of Senator Vandenberg and acquiesced in the adoption of the Section.
In order to accomplish the purposes of the Act with any degree of effectiveness, the Administrator must have the power to establish and hold a firm ceiling on prices throughout an area. This is of paramount importance. If established practices and methods of an industry do not interfere *809 with the exercise of this power, there is no necessity for the Administrator to extend his jurisdiction so as to control them. Section 2(h) was written into the Act to assure against unnecessary invasions of business management, but care was taken to make it plain that if any existing methods or practices in an industry should tend to cause an evasion or circumvention of price regulations or orders, the Administrator might control them.
In the present case, by his establishment of the prices for delivery in the Philadelphia Area, the Administrator did not undertake to invade or revamp the business practices or methods of the gypsum industry. If, in bringing about the firm fixation of prices, such result ensued, it obviously was necessary in order to prevent a circumvention of the Regulations and cannot be said to be inconsistent with Section 2(h) of the Act.
The complaint is dismissed.
NOTES
[1] 56 Stat. 23, 50 U.S.C.A. Appendix § 901 et seq.
[2] 7 F.R. 3153.
[3] 7 F.R. 5872.
[4] Lakemore Company v. Brown, Em. App., 137 F.2d 355. Decided July 15, 1943.
[5] Senate Report No. 931, 77th Congress, 2nd Session (1942), p. 15.
[6] Excerpts from transcript of hearings before the Committee on Banking and Currency of the House of Representatives on H.R. 5479 (superseded by H.R. 5990) 77th Congress, 1st Session (1941) pp. 982, 1829; 88 Cong.Rec., Jan. 8, 1942, at 105.
[7] House Report No. 1409, 77th Congress, 1st Session (1941) p. 7.
[8] 88 Cong. Rec., Jan 8, 1942, at 105.
[9] 88 Cong. Rec., Jan. 8, 1942, at 108.
[10] 88 Cong. Rec., Jan. 8, 1942, at 119.