139 F.2d 349 (1943)
PHILADELPHIA COKE CO.
v.
BOWLES, Price Adm'r. CONNECTICUT COKE CO.
v.
SAME. RAINEY-WOOD COKE CO.
v.
SAME. KOPPERS CO. (MINNESOTA DIVISION)
v.
SAME. KOPPERS CO. (SEABOARD DIVISION)
v.
SAME.
Nos. 47, Nos. 50-53.
United States Emergency Court of Appeals.
Heard October 4, 1943.
Decided December 15, 1943.
*350 *351 Gilbert W. Oswald, of Philadelphia, Pa. (William A. Schnader, of Philadelphia, Pa., on the brief), for complainants.
Morton Meyers, Atty., Office of Price Administration, of Washington, D. C. (George J. Burke, Gen. Counsel, Thomas I. Emerson and Nathaniel L. Nathanson, Associate Gen. Counsels, and Maurice Alexandre and Irving Schwartz, Attys., all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
Heard at Philadelphia October 4, 1943.
MARIS, Chief Judge.
The complainants are independent[1] manufacturers of coke and coke oven gas and represent the major independent production of coke oven gas in the United States. Their practice is to sell coke oven gas to utility companies under long term contracts which specify a basic price for the gas and contain an adjustment clause under which the price of the gas sold is varied on a fixed scale in proportion to increases or decreases in the cost of the coal from which the gas is produced. Contracts of this type are presently in force in the case of each of the complainants except the Philadelphia Coke Company. For reasons which need not here be set out that company's contract with the Philadelphia Gas Works Company for the sale of coke oven gas contains an adjustment clause which is based on increases in the cost of the production of water gas by the Gas Works Company rather than in the cost of coal to the Coke Company.
On April 28, 1942 the Price Administrator issued the General Maximum Price Regulation under which the prices of commodities generally, including the complainants' coke oven gas, were frozen at the highest prices charged by the sellers during March, 1942. Within sixty days thereafter complainants filed their protests against the General Maximum Price Regulation as applied to the sale and delivery of coke oven gas by them under their existing contracts. Thereafter the Administrator denied the complainants' protests, whereupon they filed the complaints now before us.
At the outset we are met with the question whether the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., authorized the issuance by the Administrator of a general overall regulation of prices such as the General Maximum Price Regulation here complained against. While the complainants disclaim *352 any intention of making a general attack upon that regulation, such an attack is implicit in their contention that the act does not authorize the application of the regulation to their sales of coke oven gas. They base this contention upon the proposition that the General Maximum Price Regulation may, under the terms of the act, only be applied to a commodity if the prices of that commodity have risen or threatened to rise to an abnormal unwarranted or excessive extent and upon the asserted fact that the prices of their coke oven gas have not risen or threatened to rise to that extent.
Passing, for the moment, the question of the validity of the complainants' assertion that the prices of their product have not risen or threatened to rise to an extent inconsistent with the purposes of the act, it will be observed that if the General Maximum Price Regulation is construed as applicable only to prices which are affirmatively shown to be rising or threatening to rise it ceases to be an overall price regulation, but is in effect merely an aggregation of regulations of the prices of those individual commodities whose prices have been shown to have risen or threatened to rise to an extent inconsistent with the act. We must, therefore, consider whether the act authorizes the Administrator to issue an overall regulation fixing maximum prices for all commodities upon a finding of a general threat of inflationary price increases throughout the economy but without an individual finding in the case of each commodity regulated that its prices have risen or threatened to rise to an abnormal, unwarranted or excessive extent.
In the early stages of an inflationary movement it may well be that the individual regulation of those commodity prices which are more particularly affected will be sufficient to halt the movement. There comes a time, however, in the course of an unchecked inflationary movement when it gains such momentum that inflationary pressures with their resulting rises and threats of rises in prices make themselves felt throughout the whole economy. Does the act authorize a general overall regulation of all commodity prices if and when this stage is reached? Section 2(a) of the act specifically provides that "Whenever in the judgment of the Price Administrator * * * the * * * prices of * * * commodities have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act, he may by regulation or order establish such * * * maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." This is a specific authorization to the Administrator to establish maximum prices by a single regulation when the prices of commodities generally have risen or threaten to rise to an undue extent. That Congress contemplated the exercise of this authority through the imposition of a general overall price ceiling, if it should be found necessary, appears from the legislative history of the act.[2]
The complainants strongly contend that the act is intended to prevent only those price rises which are found to be abnormal, unwarranted and excessive and that it is not intended to confer and does not confer power to prevent all rises in prices. Section 1(a) of the act states it to be among the purposes of the act "to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents;" and "to assure that defense appropriations are not dissipated by excessive prices". The act contains no definition of the terms thus used, however, and they must, therefore, be given their ordinary meaning in the light of the kind of danger which the act is intended to combat. Since it is the danger of uncontrolled inflation with which the act is concerned we may assume that only those price increases are to be deemed abnormal, unwarranted or excessive which may have a tendency to bring on or accelerate an inflationary movement. Since in the early stages of such a movement small increases in the prices of some commodities may have no such tendency, they may for that reason be considered as normal and not excessive. When the movement reaches a point, however, at which inflationary pressures begin to appear in commodity prices generally throughout the entire economy it becomes true that any increase, however small, in the price of a single *353 commodity may be inflationary both in origin and effect and may, therefore, fairly be described as abnormal within the meaning of the act. See Lincoln Savings Bank v. Brown, Em.App.1943, 137 F.2d 228; Spaeth v. Brown, Em.App.1943, 137 F.2d 669.
As we have seen, the first stated purpose of the act is "to stabilize prices". To stabilize has been defined as "To make or hold steady; to prevent fluctuations; as, to stabilize prices." Webster's New International Dictionary, 2d Ed., p. 2449, def. 2. To stabilize prices in an economy the whole of which is under general inflationary pressure involves holding them steady against any and all increases even though it may not be apparent that such increases have been brought about by inflationary pressure or that they will in their turn tend to increase such pressure upon the prices of other commodities. In a complicated economy such as ours the phenomena of price increases are the result of a complex of causes, the interaction of many economic forces. When inflationary pressure is one of the major forces operating in the economy it is wholly unrealistic to consider the price of a single commodity as in an economic vacuum and say that no threat of an inflationary increase can be discovered. Each commodity price must then be considered in the light of the fact that it forms an integral part of the whole price structure.
We conclude that if and when an inflationary movement reaches the point where it can fairly be said that inflationary pressures have so permeated the price structure that there exists in the case of substantially all commodities a threat of price increases which if permitted to take place will have an inflationary effect, all further price increases of all commodities are to be regarded as abnormal within the meaning of the act and are, therefore, subject to regulation by the Administrator. We are thus brought to the question whether at the time of the issuance of the General Maximum Price Regulation on April 28, 1942 the inflationary movement in the United States had reached that point. In the preamble to the General Maximum Price Regulation the Administrator expressed his judgment upon this matter as follows: "In the judgment of the Price Administrator the prices of commodities and services generally have risen and are threatening further to rise to an extent and in a manner inconsistent with the purposes of the Emergency Price Control Act of 1942."
His conclusion was based upon developments in the economy of the country which he summarized in the statement of considerations accompanying the regulation in the following language:
"A gap has appeared between the supply of goods and services which is available and the purchasing power or demand of the people who wish to buy these goods and services. This gap is widening. Both military and civilian demand have increased vastly in recent months. War expenditures, which totaled $1,000,000,000 in March 1941 and $2,000,000,000 in December 1941, rose to nearly $3,000,000,000 in March 1942. In December 1942, on the basis of present authorizations, these expenditures will exceed $6,000,000,000.
"Civilian demand has its source in income payments to individuals by the Government and by industry. The rate of monthly increase in these payments has advanced from one-half of one percent in the months immediately following the outbreak of the war in September 1939 to 1 percent, to 1½ percent, and since March 1941 to 2 percent. There is evidence of a further acceleration in this rate of increase in the future.
"The supply of civilian goods and services available for purchase from this income is diminishing. Manpower, materials, and machinery are being devoted to the production of planes, ships, tanks, and guns instead of to the production of civilian goods and services. The supply of such civilian goods and services will be progressively reduced by approximately 1 percent per month for the balance of this year.
"During 1941, it is estimated, individual income totaled $92,000,000,000. Of this amount $18,000,000,000 was accounted for by personal taxes and individual savings, and $74,000,000,000 was spent on consumers' goods and services.
"During 1942, at the present rate of increase of income payments, individual income will total $117,000,000,000. Of this amount, it is estimated $31,000,000,000 will be saved or paid to the Government in personal taxes and $86,000,000,000 will be spent.
"The supply of goods and services available for civilian use totaled $74,000,000,000 in 1941. During 1942, the supply will *354 total $65,000,000,000, computed on the basis of 1941 prices. Making allowance for the increase in prices which took place prior to April 1, 1942, the supply will total $69,000,000,000.
"Thus, demand in 1942, unless limited, will exceed supply by $17,000,000,000."
The complainants offered no evidence to disprove the facts thus relied on by the Administrator and we must accordingly accept them as correct. Montgomery Ward & Co. v. Bowles, Em.App., November 5, 1943, 138 F.2d 669. In our opinion they disclose a situation which justified the Administrator under the authority conferred upon him by the act in imposing a general overall ceiling upon the prices of all commodities including those whose prices had not risen or given evidence of a threat of an imminent rise. The extent of the inflationary pressure exerted by a pool of excess purchasing power as large as $17,000,000,000 in a single year staggers the imagination. Its existence presented in 1942 and still presents a frightful peril to the nation. Certainly the existence of this tremendous pressure justified the conclusion of the Administrator that the whole price structure was threatened with inflationary increases.
In his first quarterly report to Congress the Administrator made the following statement in explanation of his action:
"Price control had been extended on a piecemeal basis to each spot where inflation threatened. Formal and informal controls combined had brought half of the economy under control at the wholesale level. To stabilize the remainder of the economy at the wholesale level by piecemeal methods would require hundreds, if not thousands, of additional individual price actions. To stabilize retail prices on a similar basis would require almost innumerable individual price schedules.
"This type of approach presented extremely difficult mechanical and administrative problems. But this was not the important point. The prime question that had to be considered and resolved was whether a serious inflation could be averted by a piecemeal program. The time had come for a reappraisal of the general situation.
"As to prices themselves, it was clear that most of the major components of the general index of wholesale prices were moving up sharply. Inflationary pressures were spreading from one commodity to another  from local segments of the economy to the entire business structure. Pressure on prices was no longer specific and local; it was becoming general."
After the issuance of the General Maximum Price Regulation and in the light of this explanation by the Administrator of his reasons for issuing it Congress twice enacted amendments[3] of the Emergency Price Control Act and three times appropriated[4] funds to carry on the activities of the Office of Price Administration, in each case without expressing disapproval of the General Maximum Price Regulation or in any way restricting the use for its enforcement of funds appropriated to the Office. We are justified in drawing the inference that the Administrator's interpretation of the act as giving him authority to issue an overall price regulation has met with Congressional acceptance and approval. Norwegian Nitrogen Co. v. United States, 1933, 288 U.S. 294, 313, 53 S.Ct. 350, 77 L.Ed. 796; Costanzo v. Tillinghast, 1932, 287 U.S. 341, 345, 53 S.Ct. 152, 77 L.Ed. 350.
What has been said disposes of the complainants' contention that the General Maximum Price Regulation should not be applied to the prices of their coke oven gas for the reason that those prices have not risen or threatened to rise to an extent inconsistent with the purposes of the act, but that, on the contrary, those prices are fully stabilized under the provisions of the long-term contracts under which the gas is sold. Moreover those prices are not in fact stabilized as the complainants assert. On the contrary there is a very real threat of an increase in the prices of complainants' gas to an extent inconsistent with the purposes of the act. It is true that the complainants' sales contracts do definitely fix the prices at which the complainants may sell their gas both now and for some time to come. In this sense it might be said that their prices are stabilized. But this does not mean that the purchasers of the gas are not presently threatened with increases in the price. On *355 the contrary the very terms of the contracts make it certain that, except for the intervention of the General Maximum Price Regulation, the prices of the complainants' coke oven gas will increase as the price of the coal from which the gas is produced increases.
Thus a very definite threat of an increase in the price of coke oven gas faces complainants' customers. That such an increase, if permitted to take place, will involve an inflationary pressure upon the utility companies which purchase the gas from the complainants cannot be doubted. It is of no significance that since those companies are themselves subject to rate regulation they may be unable without approval of the regulatory authorities to pass such an increase on to the ultimate consumers. The Emergency Price Control Act is not directed at the stabilization of retail prices alone but gives authority to stabilize prices at every level of production and distribution. Its stated purpose is not only to protect "consumers" from inflationary increases in the prices of the commodities they must buy but also to afford similar protection "to persons engaged in business." The complainants' argument that the peacetime operation of their price adjustment clauses has not resulted in an increase in the price of the gas to the ultimate consumers does not convince us that such an increase would not result if the inflationary movement in our present wartime economy should get out of hand. Certainly we cannot assume that the utility commissions which fix the rates charged by complainants' customers would be deaf to what well might be justifiable requests for rate increases under such circumstances.
We conclude that the Emergency Price Control Act authorized the Administrator in April, 1942, to impose a ceiling upon the prices of the complainants' coke oven gas by means of a general overall regulation. The question remains whether the General Maximum Price Regulation, as applied by the Administrator to the sale of the complainants' coke oven gas, complies with the requirement of the act that it shall be generally fair and equitable, or whether, as the complainants contend, its application to the sale of their product is arbitrary and unreasonable and, therefore, invalid.
The act very properly lays down certain standards to which maximum price regulations shall conform. One of these is that such a regulation shall be generally fair and equitable in its application to the sellers of a particular commodity. In other words a regulation fixing the maximum price to be charged by the sellers of a commodity must be fair and equitable in its application to the group of sellers considered as a whole. If its application to a major portion of the industry is unfair or inequitable it does not meet this standard. The act does not require, however, that a regulation shall protect each individual member of the industry in the enjoyment of his customary profits. United States Gypsum Co. v. Brown, Em.App. 1943, 137 F.2d 803.
The act also directs the Administrator in issuing price regulations to take account of all relevant factors which he finds to be of general applicability including "general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the commodity." Sec. 2(a). Here again the act is concerned only with factors of general applicability in the industry. The complainants argue that this provision requires the Administrator to make adjustment for general increases in costs of production and transportation, independent of the question of the state or degree of profit or loss of a given seller or his industry. We do not so read the act. The Administrator must act in the light of all the relevant factors. He cannot rely upon one while ignoring others equally relevant. For it may appear that increased costs in some directions will be offset by other factors which tend to decrease costs and increase profits. See Chatlos v. Brown, Em.App.1943, 136 F.2d 490; Spaeth v. Brown, Em.App.1943, 137 F.2d 669.
The complainants urge that it is unreasonable and arbitrary for the Administrator to freeze the price of their coke oven gas rigidly at the level of March, 1942, while at the same time permitting large increases in the price of the bituminous coal from which their gas is manufactured. It is conceded that such increases have been permitted by amendments which the Administrator has made to Price Regulation No. 120 regulating the price of bituminous coal. The complainants' contention is that *356 it is basically unfair and unreasonable to freeze the price of one commodity processed from another without adjustment to large increases in the cost of the basic material. The argument thus is based upon the proposition that it is unfair, unreasonable and contrary to the intention of the act for the Administrator to issue a regulation which operates to prevent a manufacturer or dealer in commodities from passing on to his customers increases in his costs regardless of whether those increases have actually prevented him from realizing a reasonable profit upon his operations.
The present complainants have stated expressly that they do not base their complaints upon the ground that the application of the General Maximum Price Regulation to the sale of coke oven gas has prevented the independent producers of that gas as a group from realizing a reasonable profit upon that business. If such were the case a different situation would be presented which might afford valid grounds for contesting the application of the regulation to the complainants. Moreover the Administrator concedes that it is his statutory duty to revise his price regulations from time to time if upon consideration of all relevant factors, of which general increases in costs is one, it appears that the regulation is no longer generally fair and equitable to the industry. Therefore, if after the issuance of a regulation a general industry-wide increase in costs of production and transportation should take place which results in an unreasonable decrease or in a complete wiping out of the profits realized by the industry, that fact would doubtless afford new grounds for protest of the regulation. See Chatlos v. Brown, Em.App.1943, 136 F.2d 490. The fact, however, that the regulation prevents the complainants from passing on to their customers a part of their increased costs by charging the increased prices which their existing contracts authorize does not of itself render the application of the regulation unfair or inequitable as to them.
The complainants say that since in any event the price of gas to the ultimate consumers would not be affected, the sole effect of the regulation is to give to their utility company customers an unsolicited release from their existing contractual obligations to absorb a portion of the increased cost of the manufacture of the gas and to impose the whole burden of the increase upon the complainants. This, they say, does not in any way effectuate the purposes of the act. But, as we have seen, the complainants' premise cannot be sustained and without it the point is of no validity. It will unquestionably be necessary for the Administrator in carrying out the enormous task assigned to him to authorize increases here and there in the price structure from time to time as he has done in the case of bituminous coal. These increases may become necessary in order to stimulate the production of some commodities in the quantities required by the nation or in order that the price regulations applicable to other commodities may continue to be fair and equitable in the light of changing costs and profits. Such increases will no doubt be inflationary in their effect and, therefore, abnormal even though they are necessary in order to carry out the statutory mandate that price regulations shall not bear unfairly and inequitably upon the industry regulated. When such price increases do have to be made at a particular level in the price structure it does not follow that corresponding increases must be made at all other levels. On the contrary such corresponding increases may be wholly inconsistent with the purposes of the act, since one of its primary purposes is to protect the vast army of salary and wage earners from having to bear the brunt of all such increases. Consequently when such price increases are permitted it is the duty of the Administrator so far as possible to require them to be absorbed at some appropriate intermediate stage in the process of production and distribution at which there may be an existing margin of profit reasonably sufficient to absorb them. The complainants have made no showing that they do not have in their industry a margin of profit sufficient to absorb the increased cost of coal. In the absence of any such showing it cannot be held that the Administrator was not acting within the limits of his statutory discretion or that he was arbitrary or unreasonable in requiring the complainants to absorb the increase.
The complainants next contend that the application of the General Maximum Price Regulation to their business places the long-term contracts upon which their entire business structures have been founded in jeopardy of being declared invalid. We are not impressed with this contention. The complainants rely for its *357 support upon the case of In re Kramer & Uchitelle, 1942, 288 N.Y. 467, 43 N.E.2d 493, 495, 141 A.L.R. 1497. In that case the seller under a contract for the sale of merchandise as to which a price regulation had subsequently established a lower price than that fixed in the contract refused to make delivery under the contract. The court held that the seller was excused from performance, saying: "By act of Government there was complete frustration of performance excusing the seller from performance as matter of law." The situation with which we are confronted in the present case is wholly different, however. Here, if the complainants promptly elect to carry out the contracts at the prices fixed by the regulation the utility companies who purchase the gas can hardly object for they are in fact benefited by the application of the regulation since its sole effect is to suspend the operation of the contract clauses which provide for an increase in the prices which they must pay. But this we need not decide since we are satisfied that even if the necessary incidental effect of the regulation is to invalidate the contracts it may not for that reason be regarded as arbitrary or unreasonable in its application to the complainants.
The effect of the acceleration clauses in the complainants' contracts is to regulate the extent to which increases in their costs may be passed on to their customers by way of increased prices for their gas. But, as we have seen, it is one of the primary functions of the Price Administrator to determine at what stage in the processes of production and distribution necessary increases in the prices of raw materials and in other costs are to be absorbed. It is for him to decide, after considering the whole economy of the country and all the factors which bear upon the question, whether such increased costs are to be absorbed immediately by the manufacturer or whether they are to be passed down, by way of increased prices, to be absorbed at a later stage in the process of distribution or at the consumer level. The possible prejudice to the complainants' existing contracts is undoubtedly one of the factors for the Administrator to consider in deciding this question in their case, but it is not a necessarily decisive factor, and insofar as the complainants by these contracts have sought to settle this question for the future in their industry they have encroached upon the legislative power which Congress has delegated to the Administrator. The contracts, insofar as they provide for increased prices, accordingly cannot stand as against the judgment of the Administrator that the purposes of the act require that the increased costs to which the contracts refer ought not to be passed on to the complainants' customers in the form of increased prices. As was said by Justice Holmes in Dillingham v. McLaughlin, 1924, 264 U.S. 370, 374, 44 S.Ct. 362, 364, 68 L.Ed. 742: "The operation of reasonable laws for the protection of the public cannot be headed off by making contracts reaching into the future." See our discussion of a similar contention under the rent control provisions of the act in Taylor v. Brown, Em.App.1943, 137 F.2d 654, certiorari denied November 15, 1943, 64 S.Ct. 194. The Administrator's judgment is of course based upon the proposition that the application of the regulation to the complainants' industry is generally fair and equitable. As we have already indicated, a different question might well be raised if it appeared that the margin of profit in the complainants' industry will be unreasonably impaired thereby. The complainants, however, have made no such showing here.
The complainants contend that the General Maximum Price Regulation as applied to their business violates Section 2(h)[5] of the act in that it destroys their fundamental and established business practice of selling coke oven gas at a base price continuously adjusted to changes in the cost of coal. It may be conceded that in a broad sense this is a business practice but we are clear that it is not a business practice within the meaning of Section 2(h) of the act. On the contrary it is what may fairly be described as a pricing practice and is, therefore, unquestionably within the regulatory power of the Administrator. It would wholly destroy the effectiveness of the act if Section 2(h) were to be construed as placing it beyond the power of the Administrator to deal with established business *358 practices which directly affect the fixing of the prices of commodities. It is obvious that any control of prices will directly interfere with those business practices which relate to the fixing of prices. It was only to make sure that the Administrator would not go beyond his price regulating function and engage in an effort to reform business practices which were not directly related to prices that Section 2(h) was inserted in the act. See United States Gypsum Co. v. Brown, Em.App.1943, 137 F.2d 803.
Finally the complainants contend that the General Maximum Price Regulation as applied to their sale of coke oven gas violates the Fifth Amendment. For the reasons already stated we think that the regulation as applied to the complainants' sales is within the war power of Congress and accordingly does not deprive the complainants of their property without due process of law. See our discussion of a similar contention arising under the rent control provisions of the act in Taylor v. Brown, Em.App.1943, 137 F.2d 654, certiorari denied November 15, 1943, 64 S.Ct. 194.
The complaints are dismissed.
LAWS, Judge (concurring).
I agree with the disposition of these cases and generally with the views stated in the opinion of the Court, but since there are statements with which I differ and since they may affect future cases, it may be useful to state my views respecting them.
In my judgment the record before us does not establish, as the opinion of the Court in effect states, that any increase in the price of coal to producers of coke oven gas would have a tendency toward inflation and therefore might be controlled by the Administrator. In the usual case any price increase whatever might tend toward inflation because it would affect, or tend to affect, the public. But the industry here concerned is different from most of those affected by the Regulation. The consuming public does not purchase directly from the industry, but from utility companies supplied by it. Protection is afforded against increased prices to the public through regulation by public utility commissions, since they approve only rates which will yield returns on investments similar to those the Administrator ordinarily would allow. Throughout this industry, long term contracts customarily have been made. By them, increases in prices of coal, the principal product used in the manufacture of the gas, are divided between producers of the gas and their utility company customers. According to the record it has not been the practice in previous years to pass these increases on to consumers. Public utility commissions would not permit increases in the rates charged by the public utility companies upon a showing only that there had been coal price increases within the range of previous years. Therefore, it seems to me purely theoretical to reason that the consuming public is threatened with increases in prices simply because of an increase in coal prices paid by the industry. If and when prices of coal rise beyond the heights of previous years (increases may occur only when the Administrator finds they are required by the Act), there may be a threat to the public of a price rise, and then is the time when the Regulation properly might be applied to the coke oven gas industry. In view of these circumstances I think it does not appear affirmatively from the record that at the time of the issuance of the General Maximum Price. Regulation there was, because of actual or threatened increases in coal prices, such a threat of inflation as would justify the imposition of a price freeze by the Administrator upon the coke oven gas industry. Therefore, if this were the only basis for finding a threat of inflation, I believe complainants would be entitled to relief. Granting the right of the Administrator to issue a general over-all regulation, nevertheless if later he had been shown that the Regulation, insofar as the coke oven gas industry was concerned, was not necessary in order to protect the public, but had only the effect of interfering with important contracts between producers, it would have been arbitrary and unreasonable as to that industry and should have been lifted.
However, in the coke oven gas industry and in the industries using its goods and services, there may be threats of rises in production costs other than costs of coal and these rises combined with those in coal costs may menace consumer prices. The record before us is barren of any showing that there are no threats of rises with respect to these items. Since complainants have the burden of showing such a cumulative threat did not exist, and their evidence fails in the respect mentioned, the views which I have expressed contrary to those in the opinion of the Court do not afford a basis for their relief.
*359 I am not in accord with the statement in the opinion that because business practices in an industry may fairly be described as pricing practices they are within the regulatory power of the Administrator. I think this statement is too general. As we said in United States Gypsum Company v. Brown, Em.App. August 19, 1943, 137 F.2d 803, if business practices tend to cause evasion or circumvention of price regulations, the Administrator may control them. But unless the practices, whether they relate to pricing or not, have some such tendency, the Administrator has no right to interfere with them. As I perceive, there may be no clear distinction in many cases between "business practices" and "pricing practices". But if it be granted a distinction can be established in every case, nevertheless this test is not necessarily determinative of whether the practices may or may not be interfered with by the Administrator. The test laid down in the Gypsum case, supra, is both simple and decisive and I think should control. Complainants have not satisfactorily shown that their practices which have been interfered with have not had a tendency to cause evasion or circumvention of the Administrator's control of prices in the coke oven gas industry, and thus again the view which I hold does not affect the disposition of the cases before us.
With the foregoing comments, I concur in the conclusion reached that the complaints should be dismissed.
NOTES
[1] That is, they are wholly unaffiliated with the public utility companies to whom they sell their coke oven gas.
[2] See Hearings on H. R. 5990, before House Committee on Banking and Currency, 77th Cong. 1st Sess. pp. 862, 863; Hearings on H. R. 5990 before Senate Committee on Banking and Currency, 77th Cong. 1st Sess. p. 213; Senate Report No. 931, 77th Cong., 2d Sess. p. 14; remarks of Senator Brown in the Senate on January 7, 1942, 88 Cong. Rec. p. 78.
[3] Act of October 2, 1942, 56 Stat. 767; Act of July 16, 1943, Pub.Law 151, 57 Stat. 566.
[4] Act of July 25, 1942, 56 Stat. 711; Act of October 26, 1942, 56 Stat. 996; Act of July 12, 1943, Pub.Law 139, 57 Stat. 524.
[5] "(h) The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, except to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act."