210 F.2d 658
 GEORGE V. TRIBE CO.
v.
KENDALL, Assistant Director, Office of Defense Mobilization.
 No. 606.
 United States Emergency Court of Appeals
 Heard at Salt Lake City, Utah, November 18, 1953.
 Filed February 25, 1954.
 
 Zar E. Hayes, Salt Lake City, Utah, with whom Calvin L. Rampton, Salt Lake City, Utah, was on the brief, for complainant.
 Katherine Hardwick Johnson, Washington, D. C., Attorney, with whom Warren E. Burger, Asst. Atty. Gen., Edward H. Hickey, Chief, General Litigation Section, Department of Justice, and James A. Durham, Acting General Counsel, and Israel Convisser, Asst. Gen. Counsel, Economic Stabilization Agency, Washington, D. C., were on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MAGRUDER, Judge.
 
 
 1
 Complainant George V. Tribe Company during the period from 1946 through June, 1952, was a franchised dealer in Lincoln-Mercury automobiles, and engaged in the retail sale of such automobiles in Ogden, Utah. As such, its prices became subject to regulation under the Defense Production Act of 1950, 64 Stat. 798, 50 U.S.C.A.Appendix, § 2061 et seq. On January 26, 1951, the Director of Price Stabilization issued the General Ceiling Price Regulation, 16 F.R. 808, which froze complainant's retail prices at the highest level of its prices which were in effect during the base period December 19, 1950 to January 25, 1951. This regulation was superseded on March 2, 1951, as to the commodity in question, by General Ceiling Price Regulation, Supplementary Regulation 5 — Retail Prices for New and Used Automobiles, 16 F.R. 1769. See Norman-Frank, Inc. v. Arnall, Em.App.1952, 196 F.2d 502, which pointed out that SR 5 was designed temporarily to establish a uniform pattern of ceiling prices for automobiles until a permanent regulation could be prepared with the advice of representatives of the industry. The Statement of Considerations accompanying SR 5 recited that the formula prices established therein "effect no substantial change in the general level of prices for new automobiles established by the General Ceiling Price Regulation." [Italics added.] Of course that obviously did not mean that each and every automobile dealer could assume that his individual maximum prices under SR 5 would remain the same as they had been under the General Ceiling Price Regulation; for the whole point of issuing SR 5 was, as explained in the Statement of Considerations, "to correct the lack of substantial uniformity in the established ceilings" fixed by the freeze technique of the General Price Regulation. In its turn, SR 5 was superseded by Ceiling Price Regulation 83 on October 15, 1951, 16 F.R. 10594.
 
 
 2
 Pursuant to § 409(c) of the Defense Production Act, a civil suit was brought by the United States in the United States District Court for the District of Utah against George V. Tribe Company to recover damages for overcharges in the sales of new automobiles. This suit resulted in a judgment against the defendant entered June 16, 1952. Thereafter George V. Tribe Company obtained leave of the district court, pursuant to § 408(d) of the act, as amended, to file in this court a complaint challenging the validity of provisions of the regulation upon which such enforcement suit was based. Since the period of alleged violations was from March 2, 1951, to June 27, 1951, this court is now concerned only with the validity of SR 5, which was applicable to complainant's sales during that period.
 
 
 3
 We need consider and discuss only two objections urged against the validity of SR 5: (1) That the established ceiling prices for new automobiles in SR 5 were fixed in disregard of § 402 (g) of the Defense Production Act, in that such prices failed to permit the addition of certain advertising charges to the manufacturer's suggested retail price, and (2) that SR 5 was fatally ambiguous, vague, and uncertain and unintelligible, in that it failed to make clear whether it was applicable only to transactions in which the consideration was paid exclusively in cash on or before delivery, or whether it also applied to transactions in which part of the consideration was a traded-in car, or in which part of the cash consideration was payable on a credit basis after delivery — with the result that complainant did not and could not know what prices it might lawfully charge for new automobiles except in the relatively infrequent transactions where the entire consideration was payable in cash on or before delivery.
 
 
 4
 We think that neither of these objections is well-taken.
 
 
 5
 The basis of the first objection is as follows: A new automobile was defined in § 2 of SR 5 as meaning any automobile, including its standard equipment, for which the manufacturer published a suggested price for sales at retail. Section 3 of the regulation established as the basic ceiling prices for the retail sales of new automobiles the manufacturers' suggested list prices for sales at retail in effect prior to January 26, 1951. The ceiling delivered price for a new automobile was prescribed as the sum of the manufacturer's suggested list price for the automobile and for any extra, special or optional equipment, plus certain charges enumerated in § 3 for transportation, taxes, preparing and conditioning, and for special services requested by the customer. It appears that during the base period prescribed in the General Ceiling Price Regulation, and for many months prior thereto, it had been the practice of the manufacturer of Lincoln and Mercury cars to include as a part of the billed cost to dealers an amount of $50.00 per car for each new Mercury sold by the factory to dealers, and an amount of $65.00 per car for each new Lincoln, which said charges represented cooperative factory and dealer advertising; that the dealers could not obtain such cars from the factory without payment of these advertising charges as part of the cost; that during the period mentioned it had been the policy and practice of complainant, and of Mercury and Lincoln dealers generally in the so-called "Intermountain Area" comprising the States of Utah, Idaho, and parts of Nevada and Montana, to add in said factory-imposed advertising charges as a component of the dealer cost which was passed on to the retail purchaser and paid for by him as a part of the retail price of the car. Hence when complainant's sales were governed by the freeze provisions of the General Ceiling Price Regulation, its maximum prices for retail sales included such advertising charges, because these charges had been reflected in its highest prices prevailing during the base period. But when SR 5 went into effect, the pricing formula prescribed in § 3 of that regulation did not permit complainant to include such advertising charges as an item in the computation of its ceiling delivered prices for sales of new automobiles at retail. The regulation thus ran afoul, so complainant contends, of § 402(g) of the Defense Production Act reading as follows:
 
 
 6
 "The powers granted in this title shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, except where such action is affirmatively found by the President to be necessary to prevent circumvention or evasion of any regulation, order, or requirement under this title."
 
 
 7
 An identical provision was contained in § 2(h) of the Emergency Price Control Act of 1942. This court had occasion to consider the provision of the earlier act, in United States Gypsum Co. v. Brown, Em.App.1943, 137 F.2d 803, certiorari denied, 1944, 320 U.S. 799, 64 S.Ct. 427, 88 L.Ed. 482; and concluded that § 2(h) had been written into the act "to assure against unnecessary invasions of business management, but care was taken to make it plain that if any existing methods or practices in an industry should tend to cause an evasion or circumvention of price regulations or orders, the Administrator might control them." 137 F.2d at page 809. We referred to the legislative history of the provision as follows 137 F.2d at page 808:
 
 
 8
 "An analysis of the legislative history of this Section discloses that the Section was originally added to the Bill proposed by the House Committee on Banking and Currency, at the suggestion of advertising interests, which feared that the authority of the Administrator might be used to curtail advertising expenditures on the theory that they contributed to rising prices. As consideration of the subject developed, the Section was altered in the House Bill to include `business practices or cost practices, means or aids to distribution (such as advertising).' The Price Control Bill reported by the Senate Committee on Banking and Currency did not contain a similar section because, as stated by Senator Taft, a member of the Committee, `* * * it did not think the bill gave * * * the power to interfere with any such practices'. The Section was added to the Senate Bill on the floor of the Senate at the suggestion of Senator Vandenberg, who stated that it was `simply an effort to make sure that the authority granted in the bill does not permit the price controller to reach down into the business practice of an institution and undertake to revamp it.'
 
 
 9
 "At another point, Senator Vandenberg stated that: `The sole purpose of the amendment, Mr. President, is to make sure that the bill is simply a price-control bill, and not a business management-control bill. * * *'
 
 
 10
 "The Congressional Record shows that Senator Brown, who sponsored the Bill through the United States Senate and who now is the Price Administrator, agreed with the interpretation of Senator Vandenberg and acquiesced in the adoption of the Section."
 
 
 11
 But it is clear enough that the provisions of SR 5 did not "compel" nor indeed, so far as appears, did they induce, any change in the existing method or amount of cooperative factory and dealer advertising, with part of the cost thereof assessed by the manufacturer against the dealer and included as an item in the factory invoices. The pinch of SR 5 was not in curtailing advertising but in preventing complainant from treating such advertising as a direct cost to be passed on as such to the retail purchaser rather than as an overhead factor to be absorbed by the gross profit margin afforded by the manufacturer in selling to the dealer at a discount on the list price. Though complainant's accustomed net profits might thereby have been reduced, this did not necessarily render the regulation invalid. It is not contended that the prices established by SR 5 failed to meet the basic general standard in § 402(c) of the act, that the regulations must be "generally fair and equitable".
 
 
 12
 In Philadelphia Coke Co. v. Bowles, Em.App.1943, 139 F.2d 349 this court, again considering § 2(h) of the Emergency Price Control Act, made a distinction between methods or practices of a seller in computing his prices, and ordinary business practices which § 2(h) forbid the Administrator to disturb. We said in 139 F.2d at page 357:
 
 
 13
 "The complainants contend that the General Maximum Price Regulation as applied to their business violates Section 2(h) of the act in that it destroys their fundamental and established business practice of selling coke oven gas at a base price continuously adjusted to changes in the cost of coal. It may be conceded that in a broad sense this is a business practice but we are clear that it is not a business practice within the meaning of Section 2(h) of the act. On the contrary it is what may fairly be described as a pricing practice and is, therefore, unquestionably within the regulatory power of the Administrator. It would wholly destroy the effectiveness of the act if Section 2(h) were to be construed as placing it beyond the power of the Administrator to deal with established business practices which directly affect the fixing of the prices of commodities. It is obvious that any control of prices will directly interfere with those business practices which relate to the fixing of prices. It was only to make sure that the Administrator would not go beyond his price regulating function and engage in an effort to reform business practices which were not directly related to prices that Section 2(h) was inserted in the act."
 
 
 14
 We adhered to the foregoing interpretation of § 2(h) of the Emergency Price Control Act in Crawford & Doherty Foundry Co. v. Bowles, Em.App.1944, 146 F.2d 861, 862, and in California Lima Bean Growers Ass'n v. Bowles, Em.App.1945, 150 F.2d 964, 970. When Congress included the identical provision in the Defense Production Act of 1950, the language must be taken to have been adopted with its encrusted meaning.
 
 
 15
 There is a further good reason why the objection based on § 402(g) of the act must be rejected. Section 402 (g) has reference only to practices "established in any industry". The practice must be shown to be industry-wide. Lehigh Valley Cooperative Farmers v. Bowles, Em.App.1945, 148 F.2d 828, 830. The most that can be found from complainant's evidence is that it was the general practice of Lincoln-Mercury dealers in the Intermountain Area to include the cost of advertising as a component in the computation of their retail prices. But SR 5 prescribed retail prices throughout the United States for new and used automobiles by whomever manufactured; and Lincoln-Mercury dealers in that restricted area are only a small part of the "industry" affected by the regulation. In fact, from evidence introduced into the record by respondent, it appears that only about 9 per cent of automobile dealers throughout the United States had followed the practice of including a charge for advertising as a component in the computation of their retail prices during the pre-Korean period. It did not appear, even in the Intermountain Area, that automobile dealers generally, aside from Lincoln-Mercury dealers, followed any such practice. Even among Lincoln-Mercury dealers throughout the United States as a whole, the survey conducted by respondent indicated that only about 17 per cent had passed on to their purchasers this charge for advertising. We are not impressed by complainant's critical comment upon this evidence adduced by respondent; but even if such evidence is disregarded altogether, the fact remains that complainant itself failed to establish that the alleged practice was industry-wide in extent within the meaning of § 402(g).
 
 
 16
 The second objection to the regulation — its asserted ambiguity in the language indicating types of transactions covered — is equally without merit.
 
 
 17
 Admittedly the General Ceiling Price Regulation covered the retail sales of automobiles, whether the sale was wholly for a cash consideration, or partly on terms of credit, with or without a traded-in car. Considering the declared purpose of SR 5 to supersede the ceiling prices established under the General Ceiling Price Regulation, and to substitute a pricing formula "designed to correct the lack of substantial uniformity in the established ceilings", it is intrinsically absurd for complainant to suggest that the language of SR 5 should be read as establishing ceiling prices for retail sales of new automobiles only where such sales are for a wholly cash consideration payable in full on or before delivery. This suggestion is particularly absurd in view of the concession in complainant's brief that as a matter of fact "few sales of new cars are made on a strict basis of cash, but in most instances either (a) there is a used car taken in trade as a part of the purchase price, or (b) only a part of the purchase price is paid in cash and the balance is provided to be paid on a time basis, or (c) a combination of the conditions of (a) and (b) referred to above occur to render the transaction a sale not for cash."
 
 
 18
 Complainant's contention in this respect is founded chiefly on a sentence in the concluding paragraph of § 3(g) of SR 5. As above stated, § 3 provided that the ceiling delivered price for a new automobile sold at retail should be the sum of the manufacturer's suggested list price in effect prior to January 26, 1951, plus the manufacturer's suggested list price for any extra, special or optional equipment requested by the customer in writing, plus certain enumerated charges for transportation, taxes, preparing and conditioning, and for special services requested by the customer. Then subsection (g) of § 3 concluded with the following paragraph:
 
 
 19
 "The ceiling delivered price established by this section is the price for sales for cash. The dealer may sell on other terms when requested in writing by the purchaser. Any device by which the seller increases his total realization on the sale of a new automobile over his total realization on the sale of the same model during the period December 19, 1950 to January 25, 1951, inclusive, is an evasion of this regulation (such a device, for instance, would be a decrease in the allowance for a used car, if any, taken in trade, below its reasonable value to the dealer, which value should be related to the ceiling price for the used car established by Section 4)." [Italics added.]
 
 
 20
 When Section 3(g) provided that the ceiling delivered price, computed according to the formula, was "the price for sales for cash", and then went on to say that the dealer might "sell on other terms" when requested by the purchaser, it seems to us clear that this meant no more than the ceiling delivered price computed according to the formula did not include charges in connection with the extension of credit; that the cash delivered price, so computed, was to be used as the base from which to deduct the reasonable value of a traded-in car, if any, or as a base to which might be added financing charges when the sale was on terms of credit as requested by the purchaser. Section 3(g) on its face indicates that the regulation was intended to cover not only strictly cash sales but also sales where credit was extended or where part of the consideration was a traded-in car. The concluding portion of § 3(g) makes clear that when a car was sold on other than strictly cash terms, any device used would be an attempted evasion of the regulation if it resulted in increasing the seller's total realization over his realization for the same model during the base period prescribed in the General Ceiling Price Regulation. Specifically mentioned was the device of a decrease in the allowance for a used car taken in trade below its reasonable value to the dealer. But the general language of § 3(g) also prohibited adding abnormal financing charges to the cash price computed according to the formula, where the sale transaction was in whole or in part on a credit basis.
 
 
 21
 It appears in the transcript that at none of the meetings of the Industry Advisory Committee, which was consulted from time to time by the Office of Price Stabilization, "was there expressed any opinion to the effect that the pricing regulations could not be readily understood and complied with by dealers." Furthermore, a number of complainant's own invoices included in the transcript all show in the printed form a designation "Total Cash Delivered Price", which was used as a base from which was deducted the cash paid on delivery and the traded-in car allowance, if any, and to which was added an amount for financing charges for so much of the consideration as was covered by credit terms.
 
 
 22
 In addition, if complainant thought there was any ambiguity in the language of the regulation (which we do not think there was), it could have protected itself by obtaining an "official interpretation" of the regulation in accordance with §§ 300.52 and 300.53 of Price Procedural Regulation 1, 15 F.R. 9060.
 
 
 23
 A judgment will be entered dismissing the complaint.