## CUDAHY BROS. CO. v. BOWLES, Price Administrator.

### No. 113.

United States Emergency Court of Appeals.
Heard at Chicago March 23, 1944.
Decided May 15, 1944.

Van B. Wake, of Washington, D. C. (J. D. Shaw, of Washington, D. C., on the brief), for complainant.

Jacob D. Hyman, of Washington, D. C. (Richard H. Field, Acting Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Carl H. Fulda, Atty., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

LAWS, Judge.

Complainant is a Wisconsin corporation engaged in slaughtering and dressing hogs and selling pork cuts. Its plant is situated at Cudahy, Milwaukee County, Wisconsin. In an effort to obtain the right to charge ceiling prices higher than those now applicable to certain of its products, it brings this suit challenging the validity of Revised Maximum Price Regulation No. 148. This Regulation was issued on October 22, 1942, and became effective No-

vember 2, 1942.[1] No objection to its validity was made by complainant until a protest was filed before the Price Administrator on August 20, 1943. Complainant contends that because of conditions in its business which changed after establishment of the Regulation, it acquired the right to charge higher prices permitted to be charged by its competitors whose plants are situated in a nearby area. Having found that the changes relied upon by complainant did not warrant any amendment of the Regulation, the Administrator denied the protest and complainant thereupon applied to this Court for relief.

Revised Maximum Price Regulation No. 148 provides a nation-wide program for control of prices for dressed hogs and wholesale pork cuts. Incident to its establishment, the Administrator found that prices in the industry were lowest in the central region of the United States known as the corn belt, where hog production is greatest, and that prices elsewhere increased generally in proportion to the distance of the market from this area. The Administrator therefore selected the corn belt as a zone within which base prices, fixed in terms of dollars and cents, were established as the ceiling prices which might be charged for the various wholesale pork cuts. The zone was designated the Central Price Zone. It includes Iowa and portions of Wisconsin, Minnesota, South Dakota, Nebraska, Kansas, Missouri and Illinois. East of this zone, the Administrator established the Chicago Price Zone, which includes Chicago, St. Louis, the southern half of Wisconsin and that part of Illinois not in the Central Price Zone. In the Chicago Price Zone, where major slaughtering centers account for about 20% of the total hog slaughter of the nation, the maximum price for each wholesale pork cut was established at the base price plus 25¢ per cwt. The higher ceiling was permitted because slaughterers in this area were found to obtain their supply of hogs at increased costs from markets which drew upon the more concentrated producing area further west. Maximum prices for delivery outside the Central Price Zone and the Chicago Price Zone were established at the base price plus a specified freight differential.

By the method just described the Regulation established ceiling prices for all wholesale pork cuts.[2] Special additions to the ceiling prices thus provided were authorized by the Administrator in limited areas for certain fresh pork cuts delivered for local consumption not later than one marketing day after the initial cutting of the carcass. Schedule III(b) of Section 1364.-35. These additions were authorized by the establishment of three Regions with a fixed addition permitted in each. In Region 3, which includes Chicago, part of Michigan, Indiana, Ohio, Kentucky, West Virginia and Virginia, the increase allowed is 50¢ per cwt. In Region 2, comprising western New York and Pennsylvania, the allowance is $1, and in Region 1, consisting of the remaining eastern sections of northeast United States, the allowance is $1.50. These price increases were found necessary in order to preserve extensive slaughtering facilities situated in the Regions. At the time when he issued the Regulation, the Administrator, in accordance with Sec. 2(a) of the Emergency Price Control Act, 50 U.S.C.A.Appendix § 902(a), published a statement of considerations involved in its issuance, and in connection with these provisions the following considerations were stated:

"This area [referring to the three Regions] has substantial slaughtering facilities for which hogs have customarily been secured from the corn belt in the absence of an adequate local supply. Freight rates east on live hogs are high relative to freight rates on dressed meat. In addition, there is a substantial loss in shipment caused by shrinkage and injury to animals. The differential of $1.50 on the northeastern seaboard has been calculated to equalize this loss in order that slaughtering facilities may continue to be utilized. Further west and south the differential has been reduced by successive steps in recognition of the shorter distances involved and to avoid a limit at which the differential would be so great as to create dislocation in the movement of live hogs. The differentials are available only where fresh cuts are delivered promptly for resale fresh to consumers. Economic justification for the premium is lacking where pork is used for processing, and to the extent that the

---

[1] 8 F.R. 8609. Pike & Fischer OPA Service 41:151.

[2] The Regulation defines wholesale pork cuts as follows: " * * * all cuts derived from the carcass of the hog or pig, dressed with head off and kidney and leaf fat out * * *." Sec. 1364.32(a) (3).

premium has prevailed in the industry, it has been dependent upon the higher sales value of freshly dressed meat which is discernible in the fresh cuts." [3]

Cudahy concedes that when originally issued, the Regulation, which excluded it from the increased prices allowed to be charged by those in Region 3, was in all respects valid, but it contends that because it must now look to the corn belt for a large proportion of its supply of live hogs, its situation has become like that of Chicago slaughterers who are included within Region 3 and therefore the refusal of the Administrator to include complainant within Region 3 is unjust discrimination.

■ In any case involving challenge to a regulation established by the Price Administrator, the presumption is in favor of the regulation's validity and the burden is upon one who challenges it to establish that it is not in accordance with law or is arbitrary or capricious.[4] In the case before us we find the program of price control is complex. Like the meat industry itself, it is integrated throughout the country and is sensitive to changes. It was set up after long study and experience with the problems involved. In selecting the Regions where price increases were permitted, the Administrator had the difficult task of establishing definite dividing lines where those in actual practice were not clear. Obviously in determining the boundary lines for the Regions, he was compelled to resolve many close questions and it is apparent his decisions were reached only after consideration of the experience and advice of experts. Here the Court is concerned with a "border line" question, since the circumstances of complainant are said to be like those of slaughterers just within the boundary line of Region 3.[5] The problem thus becomes more difficult than it would be if reliance were placed upon a claim of likeness to slaughterers in the heart of Region 3, far from the dividing line. From what has been stated, it is certain that in such a case this Court is not justified in directing changes in the program of control except upon a showing of evidence which is clear and compelling.

■ There is another consideration concerning the evidence which we feel is pertinent to a determination of this case. As we have indicated, the claim relied upon by complainant is one of discrimination resulting from changed circumstances in its business. In such a case, complainant must be found to have established that its situation has become in all essential respects at least substantially the same as the situation of those claimed to be favored. If in one or more respects essential to price control its situation differs from slaughterers in Region 3, its case must fail.

The record appears fairly to establish the following facts: Complainant sells to customers in Region 3 about 34% of its production of fresh pork subject to Schedule III(b) of Section 1364.35 and incurs in respect of these sales unit delivery costs substantially in excess of those incurred by Chicago packers in making sales to like points. Complainant's wage rates are generally the same as those of Chicago packers and its operating efficiency is not below the Chicago level. Complainant's operating expenses are substantially equal to those of Chicago packers. On occasion, prior to the adoption of the Regulation, complainant had found it necessary to rely on the Iowa market for live hogs (the extent is not shown), but this condition was true to only a small extent at the time the Regulation was issued and for some time thereafter. However, the percentage of live hogs slaughtered by complainant which it purchased in Iowa in competition with Chicago packers increased from 2.6% for the four weeks of November, 1942, to approximately 33% during July and the first week of August, 1943. The freight tariffs for shipment of live hogs from Iowa to complainant's plant are equal to or in excess of the tariffs from like points in Iowa to Chicago. Complainant's hog slaughtering facilities not only exceed the local supply of live hogs but exceed the total supply available to complainant by approximately 50%. There is some indication by admission of the Administrator in the record that there is only one other slaughterer in Milwaukee County and that the cir-

---

[3] Pike & Fischer OPA Service 41:165, 41:171.

[4] Madison Park Corp. et al. v. Bowles, Em.App. Dec. 27, 1943, 140 F.2d 316, 326; Philadelphia Coke Co. et al. v. Bowles, Em.App. Dec. 15, 1943, 139 F. 2d 349, 354; Montgomery Ward & Co., Inc., v. Bowles, Em.App. Nov. 5, 1943, 138 F.2d 669, 671.

[5] Complainant's plant is situated about 80 miles north of Chicago, which is the point in Region 3 nearest to its plant.

cumstances surrounding its business are the same as the complainant's. This substantially is the extent of the showing which the record makes in comparing the situation of complainant to that of slaughterers in Region 3.

The record discloses, as we have pointed out, that the purpose stated by the Administrator for granting slaughterers situated in regions distant from the corn belt the right to charge increased ceiling prices for certain fresh cuts was to aid in preserving slaughtering facilities. Large slaughter houses which could not obtain adequate supplies of hogs from nearby areas would be forced to serious impairment, if not total destruction, of their businesses if compelled to pay the extra costs incident to shipment of live hogs with no compensating return through increased prices. If an adequate supply of hogs were nearby, there would be no occasion to include a slaughterer within a region where increased prices were permitted. This being the fundamental purpose of the Administrator in establishing Schedule III(b) of Section 1364.35 and since it has not been challenged by complainant, it becomes of primary importance in this Court's consideration of complainant's objection to the Schedule.

Complainant maintains that this Court may conclude that the supply of Wisconsin hogs was inadequate to meet the demands of its business, for obviously it would not turn to the distant corn belt for 33% of its supply if Wisconsin hogs were available. This might be persuasive if it were the only evidence on the point. However, there are other facts in the record which appear to conflict with this conclusion. The Administrator introduced a table showing that at the beginning of 1943, when complainant claims a growing inability to purchase a sufficient supply of Wisconsin hogs, the number of hogs on farms in Wisconsin was larger than at the beginning of the three preceding years.[6] Although given full opportunity to do so, complainant has not denied the correctness of the figures and has offered no explanation of their inconsistency with its position. Under these circumstances, the Court is left in a state of uncertainty with respect to the controlling question as to whether or not there was an adequate supply of hogs available in Wisconsin. This alone would seem to require dismissal of complainant's case. But we find other uncertainties in the record before us.

While complainant appears to have established that there was an increase in the percentage of Iowa hogs purchased by it, there is no clear showing that the actual number of hogs purchased in Wisconsin decreased. This suggests the possibility that complainant may have undertaken, in a period of swollen demand, to expand its slaughtering activities and has therefore found it necessary to rely increasingly upon the Iowa market. The record thus leaves us uncertain with respect to another substantial point. Manifestly the Administrator in establishing the Regulation made no effort to vouchsafe the operation of slaughtering plants at full capacity or at any fixed percentage of capacity. As we have pointed out, his purpose was to protect the maintenance and continuance of existing facilities without serious impairment or destruction. It is true the record shows that complainant's facilities are only occupied to 50% of their capacity. But there is no showing that this percentage is so low as to threaten the continuance of its business, that it is a lower percentage of capacity than that attained prior to price control, or that it bears any relation to the percentage of capacity being utilized by competitors in Region 3.

There is another point as to which we find complainant's evidence fails to establish a substantial identity between it and slaughterers in Region 3. In the record there is a statement that occasionally prior to the issuance of the Regulation, complainant resorted to the Iowa market for its supply of live hogs. It seems to us this readily might occur in a competitive market and that the situation being only temporary would not require price changes. The record shows that during a period of about nine months before complainant's protest was filed, there was a trend, although not consistent, of increased purchases of Iowa hogs by complainant. But the record is devoid of any showing that such a trend would result in complainant's business becoming substantially similar to that of slaughterers in Region 3, who customarily secure their supply of hogs from the corn belt. Moreover, the purchase of approximately 33% of complainant's live

[6] U. S. Department of Agriculture, "Livestock, Meats and Wool Market Statistics and Related Data." June 1943, p. 3.

hogs from Iowa has no definite significance of which this Court may take judicial notice. There is no expert testimony or other showing in the record to indicate whether 33% is an unusually large figure or how it compares to the percentage of Iowa hogs purchased by Region 3 slaughterers. So far as this Court is advised, slaughterers in Region 3 may depend upon the Iowa market for substantially more than 33% of their live hogs.

█ Having found many vital questions unanswered by the record, we are not in a position to conclude that the Regulation as now in effect is arbitrary or capricious.

Because of our view that complainant has failed to establish its case insofar as it alone is concerned, we do not find it necessary to discuss the Administrator's contention that the Regulation, being of general application, may not be invalidated on the basis of individual changes in circumstances.

█ Complainant's contention that its exclusion from Region 3 deprives it of a generally fair and equitable margin for the processing of hogs, contrary to the provisions of the Act of October 2, 1942,[7] must also fail. Without considering the state of complainant's individual profit situation, which appears to be a subject of some dispute in the record, it is clear that it has failed to show that the margin allowed to processors of hogs is not generally fair and equitable. If it be granted that complainant is not making a fair profit in the present state of its business, there is no showing that any processors other than complainant are being deprived of a fair profit margin, or that complainant's profit situation is typical of that of any group of processors. The Act of October 2, 1942, makes no requirement that regulations must guarantee profits to individual business enterprises. The generality of this statute is the same as that of the Emergency Price Control Act of 1942 which it amends, and what we have said concerning the assurance given individual enterprises by the Emergency Price Control Act applies equally to the point here.[8]

The complaint is dismissed.

---

[7] The Act provides: " * * * in the fixing of maximum prices on products resulting from the processing of agricultural commodities, including livestock, a *generally fair and equitable* margin shall be allowed for such processing * * *." (Italics supplied). 56 Stat. 765, 50 U.S.C.A.Appendix § 963.

[8] Philadelphia Coke Co. et al. v. Bowles, Em.App. Dec. 15, 1943, 139 F.2d 349, 355; United States Gypsum Co. v. Brown, Em.App. Aug. 19, 1943, 137 F.2d 803, 807, certiorari denied United States Gypsum Co. v. Bowles, 320 U.S. 799, 64 S.Ct. 427.