**EQUITABLE TRUST CO. et al. v. BOWLES, Price Administrator.**

**No. 69.**

United States Emergency Court of Appeals.

Heard at Washington March 2, 1944.

Decided July 13, 1944.

---

"Nothing herein contained shall be taken as in limitation of the power of the State or of any citizen thereof to enforce the provisions of this Act."

Sol M. Linowitz, Chief, Court Review Rent Branch, of Washington, D. C. (Richard H. Field, Acting Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Harry H. Schneider, and Betty L. Brown, Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

LAWS, Judge.

The complaint in this case, filed on behalf of owners of more than 200 housing accommodations of various types, is an attack on Maximum Rent Regulation No. 11, issued May 27, 1942, to become effective June 1, 1942, in the Detroit Defense-Rental Area.[1] It is claimed that the Regulation is invalid because it establishes April 1, 1941, as the maximum rent date and because it fails to make adequate provision for upward adjustments of rents which on the maximum rent date were substantially lower than those generally prevailing in the Area.

In their challenge against the choice of April 1, 1941, as the maximum rent date, complainants make many different objections which may be considered under three general headings: first, that the Administrator, by acting contrary to purposes declared in the Emergency Price Control Act of 1942,[2] exceeded the authority delegated to him by Congress to establish a maximum rent date; second, that the Administrator made erroneous findings and drew improper conclusions of fact with respect to the effect of defense activities on rent increases in the Detroit Area; and third, that the Administrator discriminated against the Detroit Area by not applying the same standards in the selection of the maximum rent date as he applied in other comparable areas. It is claimed that as the result of the Administrator's action the maximum rent date in Detroit was fixed at a time approximately one year earlier than should have been chosen and that the rents were fixed at least 10% below the level which should have been permitted.

In support of their claim that the Administrator improperly exceeded his authority, complainants point to what they as-

John W. Langs, James I. McClintock, and Frank W. Donovan, all of Detroit, Mich., for complainants.

[1] On May 31, 1943, this and other Maximum Rent Regulations were combined and redesignated Rent Regulation for Housing. 8 F.R. 7322.

[2] 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq.

sert to be policies or standards prescribed by the Emergency Price Control Act of 1942 for the establishment of rent ceilings. They maintain that one of the policies is to permit normal increases of rents such as attend a stimulated war time economy and that so long as the increases are not excessive and do not hinder the war effort, they should be allowed. We do not agree with this as a general statement of a policy of the Act. It is now well settled by our decisions that even small increases in rents after defense activities begin may well be inflationary and therefore inconsistent with the primary purpose of the Act.[3] Except where special circumstances are shown to exist, which make the continuance of such increases necessary for the fair and equitable treatment of landlords generally throughout the area concerned, or otherwise necessary for the effectuation of the purposes of the Act, there is no policy to permit them.

But complainants' contention goes beyond this general claim. They argue that they should have been allowed to retain increases in this case because as of the time the maximum rent date was established other costs of living had increased out of proportion to rent increases. They refer to statistics introduced in the record which, they maintain, show that prices and wages increased excessively in Detroit, while rents were closely regulated. These statistics, using 1935–1939 averages as 100, show that rents increased from 107.8 in 1939 to approximately 114.4 in 1943. During the same period the cost of all items increased from 100.2 to 126, food costs rose from 96.2 to 138.8, clothing from 100.1 to 129.7, and house furnishings from 101.3 to 123. Between November 1939, and December 1942, according to evidence submitted by complainants, average weekly earnings of Detroit factory workers increased from $35 to $56. Complainants take the position that while the law does not require uniform percentage increases in the costs of all items, nevertheless the Administrator is required to preserve some reasonable balance between the different segments of the economy. They suggest that the minimum increase of rents to which landlords are entitled should be relatively the same as that permitted other items. In the same connection complainants maintain that the Administrator has disregarded a declared purpose of the Act to protect investors (including landlords) from undue impairment of their standard of living.

We find no requirement in any part of the Act that the Administrator must maintain any ratio or balance between the controlled levels of rents and those of wages and commodity prices.[4] On the contrary, it is required only that maximum rents shall be generally fair and equitable and shall effectuate the purposes of the Act. It seems hardly necessary to refer to the inevitable inflation that would result if increases in all costs were required when rises occurred in the costs of one or a few items. Such a requirement would be contrary to the fundamental purpose of the Act. We do not decide that the Administrator in establishing rent control in an area is under no obligation to consider the existing state of other items of the economy. Such consideration is relevant to a determination whether a given ceiling on rents is generally unfair and inequitable to landlords within the Area. In the case before us while the figures submitted by complainants admittedly show that rents have not risen in proportion to wages and commodity prices, the showing is not of such character as to indicate unfair treatment to landlords. Having a tendency to indicate the contrary is a showing in the record that landlords' over-all profits under rent control have been considerably above pre-war levels in spite of the ceilings imposed.[5] The record thus fails to establish any harmful reduction in the prof-

---

[3] Madison Park Corp. et al. v. Bowles, Em.App., December 27, 1943, 140 F.2d 316, 321; Philadelphia Coke Co. et al. v. Bowles, Em.App., December 15, 1943, 139 F.2d 349, 353; Lincoln Savings Bank of Brooklyn v. Brown, Em.App., May 7, 1943, 137 F.2d 228, 231.

[4] Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669, 671.

[5] A study completed by the Administrator in January 1944, and submitted to the Court at the oral hearing of this case, discloses that net operating income for both apartment houses and small structures in Detroit generally was substantially greater during the first year under rent control than for the years 1939, 1940, or 1941. The net operating income for apartment houses, using 1939 as 100, was 128.9 for the first full year under rent control, 134.3 for 1942, 122.9 for 1941, and 101.1 for 1940. For small structures the corresponding figures were 153.9 for the first year under rent control, 160.8 for 1942, 141.4 for 1941, and 115.9 for 1940. This study

it position enjoyed by Detroit landlords. Under these circumstances, we feel we would not be justified in concluding that Detroit landlords under rent control as imposed by the Administrator are being treated generally unfairly and inequitably either by impairment of their standards of living or otherwise.

■ Complainants claim that the inflationary effect of the rent increases which occurred between April 1, 1941, and June 1, 1942, the effective date of the Regulation, had to a large extent already been spent by the time the Regulation was issued and that the Administrator has failed to show any pending demands for higher wages based upon these rent increases. From this, they conclude that the rollback of rents to the level of April 1, 1941, has not been shown to have been a step in the suppression of inflation, the underlying purpose of the Act. We find this contention to be without merit. It seems apparent that if not suppressed the rent increases which occurred subsequent to April 1, 1941, during a period of war emergency, would constitute a continuing inflationary pressure in the economy. Where the Administrator, as in this case, establishes a rollback of rents after a study of the economy and the rental increases in an area, his action will be presumed to have been correct and in accordance with the provisions of the Act. The burden then falls upon complainants clearly to establish that the rent increases disallowed were not inflationary. There is no evidence before us by which to trace the precise movement through the economy of the increases in Detroit rents. We cannot accept the suggestions and arguments of complainants as being sufficient to overcome the presumption in favor of the Administrator's action.

Complainants next contend that the Administrator misconstrued the facts supporting his selection of April 1, 1941, as the maximum rent date for the Detroit Area. They take the position that the record does not reasonably support a finding, made in the preamble to the Regulation, that "* * * defense activities had not resulted in increases in rents * * * inconsistent with the purposes of the Emergency Price Control Act of 1942 prior to April 1, 1941, but did result in such increases on or about that date."

By exhibits in the record it appears that between September 15, 1939, and April 15, 1941, 26% of all white tenants in Detroit had rent increases averaging 8.9% and 37% of all nonwhite tenants had increases averaging 13.8%. Between April 15, 1941, and May 1, 1942, 63% of the white tenants had increases averaging 10.2% and 34% of all nonwhite tenants had increases averaging 15.8%. Complainants contend these increases resulted from peacetime prosperity, not defense activities. They point out that although Detroit reached a peacetime employment peak in May and June 1941, it early appeared that the demands of national defense would curtail and perhaps completely arrest the output of automobiles for private use. This incentive and the added circumstance that defense spending throughout the country had made increased cash available to consumers resulted in large orders for automobiles of this type and wherever possible factories were put upon capacity production. Complainants state that this period of prosperity and extensive employment was followed by a recession or a falling off of employment caused by the conversion of mass production factories to war work. The recession is said to have begun in July 1941, and to have lasted until the Spring of 1942. The rise in rents during this period is accounted for by what complainants describe as a principle underlying voluminous exhibits in the record. This principle, they state, is that rises in employment and earnings are followed by other increases and that housing rentals respond usually six months to a year behind increased employment. It is claimed that it was not until the Spring or early Summer of 1942 that employment and wages rose as the result of war activities and the slower paced rents were not increased by war activities until still later. Complainants appear to conclude that for these reasons, when the Administrator fixed the maximum rent date on April 1, 1941, he violated one of the directives of the Act, implicit in Section 2(b), which is "to stabilize rents at the level at which they stood * * * on the most recent date which did not reflect increases resulting from defense activities."[6]

---

substantially corroborated earlier studies, based partially on estimates, which the Office of Price Administration had prepared and included in the record.

[6] Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669, 670. The pertinent language of Section 2(b) reads as follows: "So far as practicable, in

■ Before considering the evidence with respect to this contention, it should perhaps be noted there was no necessity for the Administrator to find that exactly on April 1, 1941, defense activities had resulted in increases of rents. As we have indicated, under the law the Administrator has the right and, in some instances the duty, to select as the maximum rent date a time before any increases due to defense activities occurred. But in order to give landlords the benefit of the latest rent increases attained solely as the result of peacetime activities, it is important to determine whether at a time shortly after April 1, 1941, defense activities had resulted in rent increases.

The record shows that the Detroit Defense-Rental Area embraces the highly industrialized southeastern corner of Michigan, including Washtenaw, Oakland, Macomb and Wayne Counties. In 1940 nearly half of Detroit's workers were engaged in manufacturing and about 80% of all manufacturing workers were employed in the production of automobiles, machinery, and iron and steel, 65% being in the automobile industry alone.[7]

By December 31, 1940, the amount of prime war contracts awarded in the Detroit industrial area (which consists of only 2 of the 4 counties in the Defense-Rental Area) reached $442,242,000. On April 1, 1941, the maximum rent date, this figure had expanded to more than $500,-000,000. In addition, the record indicates that prior to May 1, 1941, a substantial volume of subcontracts had been placed in the Area. The cumulative total of prime war contracts awarded in the Area rose month by month after the maximum rent date. Exceeding $500,000,000 on the maximum rent date, it totalled over $550,-000,000 by June 1, 1941, and almost $1,-000,000,000 by September 1. It was estimated that approximately $2,500,000,000 in subcontracts had been let in the Area before September 1941. By June 1941, 25% of the manufacturing workers in the Area

were engaged in war work. Figures compiled by the Bureau of Labor Statistics show that the index of employment in manufacturing industries in the Detroit Area rose steadily from its low point on July 1, 1940 to the 1941 peak in June.

There is evidence to support the view that the awarding of defense contracts encouraged workers from other parts of the country to converge on Detroit in 1940 and early in 1941 in the hope of finding defense jobs. It was estimated by the Federal Housing Administration that the actual increase in occupant groups in the Detroit housing market during the year preceding April 1, 1941, was about 30,000 or 5.4%; of these about 25,000 originated from in-migration to the Area. The total number of persons added to the population by in-migration during this period was estimated at 95,000.

■■ Upon this state of the record, we find that it was reasonable for the Administrator to determine that on or about April 1, 1941, defense activities had resulted in rent increases inconsistent with the purposes of the Act. We do not agree with complainants' contention that the rent increases which occurred on or about April 1, 1941, and during the ensuing months were not sufficiently related to the war effort to justify the Administrator's rolling them back. It is apparently complainants' argument that only those increases may be prevented by the Administrator which are the result of direct war activities, such as occur around cantonments and shipbuilding centers. In our opinion this is an erroneous interpretation of the Act. When war activities bring about sharp expansion of projects generally considered peacetime and as a consequence inflationary pressures result, it is reasonable to ascribe the threat of inflation to defense activities. So long as defense activities have a material bearing upon the threat of inflation, it is of no importance under the Act that they did not directly cause it. Moreover it is also true in many instances that activities involving

establishing any maximum rent for any defense-area housing accommodations, the Administrator shall ascertain and give due consideration to the rents prevailing for such accommodations, or comparable accommodations, on or about April 1, 1941 (or if, prior or subsequent to April 1, 1941, defense activities shall have resulted or threatened to result in increases in rents for housing accommodations in such area inconsistent with the purposes of this Act, then on or about a date (not earlier than April 1, 1940), which in the judgment of the Administrator, does not reflect such increases) * * * ."

[7] Impact of the War on the Detroit Area, U. S. Dept. of Labor, Bureau of Labor Statistics, July 1943, p. 1.

non-military materials are just as vital to the war effort and therefore just as clearly defense activities as anything connected directly with the production of tanks, guns and other instruments of war. Consequently it was not unreasonable for the Administrator to conclude that production of automobiles which was stimulated by defense spending and by anticipation of curtailments due to the defense program was closely connected with the war program and that he had the authority to prevent rent increases which might result from such activities.

■ The Administrator's designation of the activities affecting Detroit rents on or about April 1, 1941, as defense activities does not, however, rest alone upon the ground we have just stated. It is apparent, as we have indicated, that before and after the maximum rent date Detroit was girding itself for production of direct war materials. Substantial war contracts had been let prior to the maximum rent date and there is evidence that to some extent actual production under some of these contracts had begun by the maximum rent date. Workers in great numbers were settling in the Area and there is positive evidence, as well as reason to assume, that they did so in anticipation of work on defense projects. There is no doubt that these various activities in the area fall within the meaning of the term "defense activities" as used in the Act.

An exhibit appears in the record, consisting of part of a transcript of testimony given on May 25, 1943, by former Price Administrator Brown before a subcommittee of the House of Representatives Committee on Appropriations, in which he is quoted as stating that the maximum rent date for Detroit may have been a mistake. Complainants refer to this statement as having significance. We are unable so to regard it. It is noted that Administrator Brown did not commit himself to the proposition that a mistake was made. And that this was not his deliberate judgment is borne out by the circumstance that less than a month later, after a full consideration of the question and the evidence bearing upon it, he denied complainants' protest challenging the date.

Where, as in this case, it appears that there were increases of rents in an area at a time when defense activities were well under way, it must be agreed that the Administrator was reasonable in drawing his conclusion that the increased rents were influenced by defense activities. Certainly complainants have not offered clear and convincing evidence to the contrary. Therefore, we conclude that the evidence supports the findings of the Administrator.

There is much evidence in the record and a discussion by the parties with reference to the recession which is said to have occurred in Detroit beginning about July 1941. It is not clear to us how this recession, which is alleged to have occurred after the maximum rent date, has any relation to issues raised in this case, with the possible exception that it might bear upon the claim that April 1, 1941, was not the most recent date on which rents were unaffected by defense activities. Having decided this issue against the complainants and they having conceded that rents rose continually after the maximum rent date until the issuance of the Regulation, we find it unnecessary to give further consideration to the claims as to the nature, extent or effect of the alleged recession.

Complainants urge that the establishment of April 1, 1941, as the maximum rent date for the Detroit Area was unfairly discriminatory. They state that although the Administrator has not proclaimed the standards which he followed in arriving at the maximum rent date in each of the various defense-rental areas, it is clear from the results obtained that the same approach could not have been employed by him in fixing maximum rent dates throughout the country. This basically appears to be a contention that the Administrator applied different standards in establishing maximum rent dates for the various defense-rental areas, with consequences unfavorable to the Detroit Area.

■ It is clear from the Act that Congress, while making provision for national control of rents, intended that such control should be made effective in local areas and upon the basis of local conditions. This is emphasized by the requirements of Section 2(b) that defense-rental areas be set up, that local officials first be given an opportunity to deal with the problems of rent control, and that recommendations of local officials be considered to the extent deemed practicable in the designation of defense-rental areas, issuance of regulations and orders, and selection of personnel. This state of the law was a recognition of the fact that there are wide variations in rents and in the factors affecting rents in differ-

ent parts of the country.[8] If Congress may be said to have expressed any preference as to the maximum rents to be established, it was for those prevailing on April 1, 1941 (the maximum rent date established for the Detroit Area). However, there can be no question of its intention to give the Administrator wide discretion in determining what rent ceiling in each area will conform to the standards prescribed by the Act.

There is no requirement in the Act that the Administrator state the considerations which influenced him in establishing the maximum rent date in an area. But the Act has been quoted and interpreted as setting up certain standards to serve as his guide. As previously noted, the maximum rent ceiling selected in an area must be such as in the judgment of the Administrator "will be generally fair and equitable and will effectuate the purposes of this Act." Sec. 2(b). This basic standard is clarified by the further language of Section 2(b) that maximum rents shall be arrived at by consideration of the rents prevailing on or about April 1, 1941, or some other date (not earlier than April 1, 1940) on which defense activities have not reflected increases inconsistent with the purposes of the Act. The Act provides that insofar as practicable, consideration shall be given to recommendations of State and local officials and that adjustments shall be made for such relevant factors as the Administrator shall reasonably determine to be of general applicability, including increases or decreases in property taxes or other costs, and including profits in the rental industry. The Constitutional sufficiency of these standards has been upheld.[9] In interpreting the Act, we have noted also its legislative history indicates that the words "generally fair and equitable" were intended to assure the establishment of ceilings which will allow a profit sufficient for the sustenance of the rental industry in a state of efficiency and for reasonable development and expansion.[10] It has been accepted that these standards authorize the selection as maximum rent date of the most recent date on which rents had not been influenced by defense activities.[11]

In applying the standards of the Act the Administrator must consider a number of important factors affecting rents in an area. In his determination of the most recent date on which defense activities have not reflected rent increases inconsistent with the purposes of the Act, he must consider the general characteristics of the area, the type of industry, if any, which existed prior to the advent of defense activities, the available supply of suitable labor, the kind and amount of defense activity introduced, the extent and rate of population growth, the trend of unemployment, the trend of wages, the supply of and demand for housing prior to the introduction of defense activities, the construction of new housing, the trend of habitable vacancies, the types of housing, the size (including percentage and amount) and frequency of rent increases, and recommendations of state and local officials. Having ascertained the most recent date not reflecting increases due to defense activities, the Administrator must still ascertain whether the rents prevailing on that day will be generally fair and equitable. In making this determination he must consider some of the above factors and also increases and decreases in property taxes and other costs and the profit situation of landlords in the area. It is commonly known that these economic factors affecting rents vary in different areas. Moreover defense activities ordinarily have not suddenly and completely swept aside the peacetime activities of the various areas. The process has been more gradual. In different areas the impact and growth of defense activities have not been the same. While it may be true that defense activities bring about the same general changes in the economies of all areas affected by them, it is undeniable that the details of the reactions differ, and it is with them that the Administrator must concern himself in selecting a date on which the rents prevailing will conform to the standards of the Act. For example, it is well known that defense activities usually lead to a shortage

---

[8] Madison Park Corp et al. v. Bowles, Em.App., December 27, 1943, 140 F.2d 316, 325; Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669, 672.

[9] Bowles v. Willingham, 1944, 321 U.S. 503, 64 S.Ct. 641.

[10] Madison Park Corp. et al. v. Bowles, Em.App., December 27, 1943, 140 F.2d 316, 324.

[11] Spaeth v. Brown, Em.App., August 4, 1943, 137 F.2d 669, 670.

of housing with subsequent rises in rents, but how soon the shortage will develop, how serious it will be, and the point at which rents will commence to rise in any particular area are variable results.

All the factors which we have named for the Administrator's consideration, and probably others, are inextricably interwoven in this question of selecting a proper rent ceiling. A charge of discrimination in applying the standards of the Act to the circumstances of various areas cannot be sustained unless a comparison is made of all these essential factors affecting rent control in the complaining area with the same factors in the areas claimed to have been favored.[12] In no other way can it be fairly established that the basic standards of the Act have been applied differently.

The evidence of complainants falls far short of the requirements for comparison with other areas. Their principal argument appears to be that the Administrator permitted larger rent increases beyond 1939 levels in other areas than he did in Detroit. To illustrate this contention they point out that Buffalo, New York, was allowed March 1, 1942, as its maximum rent date. This is said to have represented approval by the Administrator of rent increases of 9% between October 15, 1939 and the maximum rent date, while Detroit landlords were permitted increases averaging only 1.3% from October 15, 1939 to their maximum rent date. Evidence is adduced to show that in this respect Buffalo was more or less typical of many other defense-rental areas. In addition, complainants state that the amount of money represented by war contracts let in Detroit prior to the maximum rent date was less in proportion to population than the amount represented by war contracts in Buffalo. They contend that comparative employment figures indicate that Detroit was discriminated against because other areas with later maximum rent dates had greater increases in employment, even before April 1, 1941, than did Detroit, and other cities such as San Diego, California, and Wichita, Kansas, which were given April 1, 1941, as their maximum rent date had startling increases in employment while Detroit's was moderate. Complainants urge too that the explanation for the harsh treatment afforded them is not found in va-cancy statistics or in-migration figures. They urge that new construction was adequate to accommodate increased residents, and they maintain that the different treatment is not justified by differences in operating costs which they assume increased at least as much in Detroit as elsewhere.

From their argument it is clear that while complainants have recognized the necessity of comparing essential factors bearing upon rent control, they have not attempted a comparison of some we have referred to as essential and their comparison of others has been inadequate. We find nothing submitted to show the relationship between Detroit and the areas sought to be compared in respect of increases and decreases in property taxes and other costs, and the profit situation of landlords. We find complainants assume, but without any proof as a fact, that the operating expenses of Detroit landlords have increased at least as much as those of landlords in other areas. Much of the evidence adduced by complainants is contradicted. Complainants rely upon percentage increases to establish that areas given later maximum rent dates were permitted greater increases in rents than Detroit. By using this basis, the Administrator shows that Detroit landlords were treated equally or more generously than landlords in five other cities. The Administrator further shows that because the level of rents in Detroit in 1939 ranked third of 32 cities which were surveyed by the Bureau of Labor Statistics, a percentage increase in Detroit rents would represent a larger dollar and cents increase than the same percentage increase in a city where the rent level was lower. Another point stressed in connection with the percentage increase figures submitted by complainants is that they are over-all averages and therefore do not reveal important data concerning the frequency distribution of the increases, the severity of their impact, or the rate of their movement.

Beyond question it is difficult to make out a case of discrimination between different areas of the country as complainants have attempted to do. It may prove impossible for the reason that no areas can be shown to be substantially the same in all the essential factors relevant to the establishment of a maximum rent date. But it is sufficient to a disposition of the case be-

---

[12] Cudahy Brothers Co. v. Bowles, Em.App., May 15, 1944, 142 F.2d 468, 470.

fore us to hold, as we do, that complainants have not sufficiently proved their claim of discrimination to warrant a determination by this Court that the Administrator in establishing the maximum rent date for Detroit acted arbitrarily or capriciously or not in accordance with law.

Complainants make the argument that the adjustment provisions of the Regulation are not generally fair and equitable because they do not provide sufficient grounds for increasing rents. They urge that no provision is made for increasing rents for many properties for which the rent on the maximum rent date was abnormally low. Examples of such cases are said to be properties being liquidated by closed banks, properties under foreclosure on the maximum rent date, properties adjacent to colored properties occupied by white tenants on the maximum rent date, but now converted to colored, properties owned by widows and other persons not actively engaged in business, properties rented to welfare tenants on the maximum rent date and now rented to full-paying tenants, and properties on which improvements were being made over an extended period but for which the rents could not be increased because of intervention of the maximum rent date. Some of the cases suggested by complainants appear to be within the present adjustment provisions of the Regulation; others appear to be the inevitable casualties of the maximum rent date method of rent control, which we have upheld.[13] But we find it unnecessary to add to our previous discussions of these adjustment provisions[14] since complainants have introduced no evidence to establish that any of them, or any of the landlords they represent, is affected by the circumstances which they describe.[15]

We have considered other arguments suggested by complainants, apparently subsidiary to those discussed in this opinion, but have found they do not change the conclusion which we have reached as to the disposition of this case. We think there can be no doubt that there is ample evidence in the record reasonably to support the findings and conclusions of the Administrator in all essential points with relation to his selection of the maximum rent date for the Detroit Area and that the Regulation established by him should not be disturbed.

The complaint is dismissed.

[13] Chatlos v. Brown, Em.App., May 28, 1943, 136 F.2d 490, 493.

[14] Bibb Manufacturing Co. v. Bowles, Em.App., January 12, 1944, 140 F.2d 459; Hillcrest Terrace Corp. v. Brown, Em.App., July 27, 1943, 137 F.2d 663; Lakemore Co. v. Brown, Em.App., July 15, 1943, 137 F.2d 355; Wilson v. Brown, Em.App., July 15, 1943, 137 F. 2d 348.

[15] Madison Park Corp. et al. v. Bowles, Em.App., December 27, 1943, 140 F.2d 316, 329.