## HICKOK OIL CORPORATION v. FLEMING, Temporary Controls Administrator.

### No. 385.

United States Emergency Court of Appeals.

Heard at Toledo April 12, 1947.

Decided May 1, 1947.

Rolland W. Dings, of Toledo, Ohio (Kirkbride, Cole & Frease, of Toledo, Ohio, on the brief), for complainant.

Samuel M. Singer, of Washington, D. C. (Carl A. Auerbach, William R. Ming, Jr., and Harry H. Schneider, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.

LINDLEY, Judge.

Complainant is a wholesale distributor of gasoline and other petroleum products which it buys from refiners and in turn sells to other distributors including jobbers of bulk lots, tank-wagon dealers and retail service stations. Respondent instituted an enforcement suit in the District Court and, on October 1, 1946, procured judgment against complainant in the sum of $51,515 of which amount $48,549 represented overcharges arising form violation of Amendment 16 to Maximum Price Regulation No. 88, governing fuel oil, gasoline and liquefied petroleum gas. Having been granted leave by the District Court, complainant filed its complaint here pursuant to Section 204(e) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 924(e), in which it attacked the validity of Amendment 16, averring that the amendment does not effectuate the purposes of the Act; that it is not generally fair and equitable; amounts merely to an attempt to regulate profits and is arbitrary and capricious. It set out averments of fact upon which it relied in support of its contentions which, for all the purposes of this proceeding, respondent has admitted, insisting, however, that upon these facts, the amendment effectuates the purposes of the Act and is valid in all respects.

The maximum prices of petroleum products were established by Revised Price Schedule No. 88 issued February 2, 1942, 7 F.R. 718, superseded by MPR 88 issued February 14, 1944, 9 F.R. 1783. Under this regulation, maximum prices for automotive gasoline, the commodity involved in this case, were determined and fixed upon the basis of the octane content of the gasoline and the zone of operations, at all levels of distribution, including distribution through tank cars, motor trucks, pipe lines and tank-wagons. Another regulation, MPR 137, 7 F.R. 3165, governed prices at retail service station levels. To the prices fixed by MPR 88 complainant was subjected and by them it was admittedly bound; its complaint is not directed against that regulation but solely against Amendment 16.

Amendment 16 to Maximum Price Regulation No. 88, in effect from August 15, 1944 until September 1, 1945, when it was revoked, 9. F.R. 9896, was adopted, says respondent, because of facts developing during the progress of the war. In his statement of consideration, the Administrator found that gasoline was customarily sold in three grades, "Premium," "Regular" and "Third"; that, prior to issuance of Amendment 16, "Regular" gas usually had a 72-74 octane content. The petroleum administrator, in order to conserve tetraethyl lead in the interest of effective prosecution of the war, had recently promulgated a directive prohibiting distribution of "Regular" gas with an octane content in excess of 70. The Administrator found and determined that this reduction in octane content would enable refiners to reduce their cost of production by at least $\frac{1}{8}$¢ per gallon. Therefore the Administrator directed that all refineries should reduce their then existing maximum prices by $\frac{1}{8}$¢. Inasmuch as he found that this reduction in refinery cost would normally be passed down to intermediate levels in distribution, he prescribed an equivalent reduction in distributors' maximum prices. He excepted, however, sellers at the tank-wagon level, for the reason, he said, that tank-wagon resellers had made strong representations that they could not operate satisfactorily under the regulation without an increase in their profit margins. Consequently the reduction in price ended with the distribution to the tank-wagon dealers and, therefore, did not extend to that class or to consumers.

█ The burden of overcoming the presumption of validity of the amendment rests upon complainant. Montgomery Ward & Co. v. Bowles, Em.App., 1943, 138 F.2d 669; Birtcherd Dairy, Inc., v. Bowles, Em. App., 1945, 156 F.2d 1004. The question, therefore, presented to us is, are the facts averred, admitted by respondent, sufficient to overcome the presumption of validity?

Complainant's contention that the amendment does not effectuate or promote the purposes of the Act is based upon the undisputed fact that the $\frac{1}{8}$¢ per gallon reduction ended at the tank-wagon level. Complainant concedes that "had the consumer * * * been given the benefit of the price

reduction effected by the amendment, no one would deny that the amendment would have furthered the purpose of the Emergency Price Control Act. But the consumer received no benefit, and certainly no protection." It is obvious, therefore, that complainant does not take issue with the reasonableness of the ⅛¢ reduction required by the amendment; its contention is, rather, that to permit the tank-wagon dealers to operate at old prices, while the distributors on the higher levels were compelled to make a reduction, was unreasonably discriminatory and that, in view of the fact that the price to the consumer was not decreased, the amendment does not tend to effectuate the purposes of the Act.

Concerning this exemption of tank dealers from price reduction, the Administrator said in his statement of considerations that "Although jobbers and distributors selling at the tank-wagon level will by this action have reductions in their cost of the product they resell as Regular Gasoline in the amount of .125¢ per gallon, no price change is presently being made at the tank-wagon level. Strong representations have been made that the costs of distribution of tank-wagon resellers of gasoline have increased since the base period. In addition, there has been a reduction in the quantity of Premium Grade Gasoline which these resellers may distribute. * * * Pending further study of the financial position of the distributing segment of the industry, the Administrator will not revise the current tank-wagon ceilings." In his statement of considerations to Amendment 53 to Revised Price Schedule 88, the Administrator further said, concerning tank-wagon resellers: "Upon appropriate investigation and consultation with representative members of the industry, the Price Administrator has determined that the rationing of fuel oil pursuant to Ration Order No. 11, as amended, issued by the Office of Price Administration has resulted in substantial increases in costs to persons engaged in the business of delivering fuel oil in tank wagons which amount in the aggregate to approximately 0.3 of a cent per gallon. Restriction of the size of deliveries itself represents a substantial item of increased costs and the additional clerical bookkeep-

ing and coupon handling expenses incident to operations under the ration order represent further substantial items of increase. Firms distributing fuel in tank wagons have already been subjected to substantial cost increases since the October, 1941, base period designated by the schedule for computing maximum prices * * *. It is the opinion of the Price Administrator, however, that in view of the increased costs to which they have been subjected, these sellers cannot in general absorb the increased expenses incident to rationing without serious risk to their continued operation."

■ The practical situation confronting the Administrator was that, due to reduction in the octane content, the cost of production of regular gasoline had been so reduced as to justify ⅛¢ per gallon decrease in price on the part of the refiner and that this in turn would be saved to those who purchased from the refiner, that is, the wholesale distributors, and to those distributors who in turn bought from the original purchaser from the refiner, but that tank-wagon distributors were suffering from lack of sufficient margin and that they were unable, as an essential factor in the industry, to continue to do business on the existing margin. This situation fell directly within the Administrator's mandate from Congress. Section 1(A) of the Act, 50 U.S.C.A.Appendix, § 901, declares it to be among the purposes of the Act "to eliminate and prevent * * * disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency"; "to prevent hardships to persons engaged in business"; and "to assist in securing adequate production of commodities and facilities." The Administrator found himself face to face with the fact that the tank-wagon dealers were entitled to an increase in their margins. Obviously if the tank-wagon distributor were permitted to charge an additional margin, his customers, the retail service stations, would be entitled to a like increase if their relative standing in the economic set-up was not to be disturbed; and this in turn, would impose upon the consumer an increase in gasoline prices. The Administrator would have been jus-

tified, upon finding the tank-wagon dealers in an unfair economic status, in increasing their margins; thus increasing the ultimate price to the consumer. Instead of doing that, however, having found that the higher level factors in the industry, the refiner and wholesale distributors, because of a saving in cost of production resulting from the lower octane content, could take a reduction and thus make unnecessary an increase in the margins to the tank-wagon dealer or in the cost to the ultimate consumer, he made a choice of remedy which seems to us entirely reasonable and in accord with the purposes of the Act and in furtherance thereof. This is not arbitrary classification but an entirely reasonable solution of a problem justified by the facts. No evidence has been offered to rebut the finding of the Administrator in this respect.

In this state of the record it seems apparent that complainant was in no wise injured by the Administrator's selection of one of two or more possible solutions of the problem. Under Amendment 16, the complainant's purchase price was automatically reduced $\frac{1}{8}\phi$ per gallon and, in turn, its selling price reduced $\frac{1}{8}\phi$ in its resales to bulk distributors and to tank-wagon dealers. Indeed, complainant benefitted to the extent that it itself was engaged in tank-wagon distribution. The formula produced no disastrous eventualities for complainant. Its relative standing in the set-up of the industry remained the same as that of other similarly situated distributors; it retained the same margins of profit as others on the same level.

The inquiry arises then: why has complainant objected? The answer lies in the unique fact that after promulgation of Amendment 16, the Pure Oil Company, the refiner from whom complainant purchased its gasoline, filed an application with the Administrator for exemption from the reduction in price effected by the Amendment, insofar as its relationship to complainant was concerned. Strangely enough, complainant joined its supplier in this request, and the Administrator, upon the basis that there was then an existing contract between complainant and the Pure Oil Company, after considering its terms, granted the request and, with the acquiescence of complainant, issued order L-113, the effect of which was to permit the Pure Oil Company to sell to complainant without deducting the $\frac{1}{8}\phi$ which other distributors on the same level as complainant enjoyed. Such at least was the practical effect of the order. It seems obvious, therefore, that complainant's unhappy plight arises not because tank-wagon dealers were exempted from the reduction but because complainant had voluntarily joined with Pure Oil in procuring an order permitting Pure Oil to eliminate, in its sales to complainant, the margin enjoyed by other similar wholesalers. To our minds, complainant's misfortune emanated not from the fact that Amendment 16 is discriminatory or unfair but as a consequence of its own acquiescence in permitting Pure Oil to obtain exemption from the provisions of Amendment 16 insofar as the latter's dealings with complainant were concerned. The facts involved are not so simply stated but such is the inevitable result of what happened.

Complainant relies upon Hawaii Brewing Corporation v. Bowles, Em.App., 1945, 148 F.2d 846 in support of its assertion of discrimination. There the action disapproved by the court was use of a different yardstick in measuring the duties of competing members in an industry operating at the same level,—unlike treatment of equivalent factors in the industry. Here, as we have seen, under Amendment 16 all distributors at the same level were upon the same basis. The Administrator found it possible to reduce the price of gasoline at all levels in the manufacturing and distribution except that involved in the activities of the tank-wagon dealers; there he found that, in the absence of reduction to such dealers, it was probable that he would have to increase their prices and those of the ultimate consumer. As we have attempted to demonstrate, this was an entirely reasonable disposition of the problem confronting him, involving no discrimination, and in line with what we have said previously in Philadelphia Coke Co. v. Bowles, Em.App., 1943, 139 F.2d 349.

Complainant in its brief attacks the amendment as arbitrary because, it says, the Administrator did not conduct an independent investigation and acted without

a study of the comparative financial pictures of other segments or factors in the industry. But, as we have seen, at all times the Administrator believed from what he had learned that the tank-wagon reseller was in need of relief. At no time, did complainant offer evidence to the contrary. As this challenge was not included in the complaint, the attack comes too late; but even were it proper matter for our consideration, it is without merit.

Judgment will enter dismissing the complaint.