SOUTH PORTO RICO SUGAR COMPANY, CENTRAL ROIG REFINING Co., WESTERN SUGAR REFINING Co., EASTERN SUGAR ASSOCIATES y PORTO RICAN AMERICAN SUGAR REFINING Co., peticionarias, *v.* CORTE DE APELACIÓN DE SUMINISTROS, demandada.

Núm. 1793.—*Sometido:* Noviembre 7, 1949. *Resuelto:* Diciembre 1, 1949.

*James R. Beverley* y *R. Castro Fernández,* abogados de las peticionarias; *Hon. Procurador General Vicente Géigel Polanco (José Trías Monge, Procurador General Interino,* en el alegato) y *Francisco Torres Aguiar, Procurador General Auxiliar,* abogados de la interventora.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

¿Tiene el Administrador General de Suministros, de conformidad con la Ley núm. 228, Leyes de Puerto Rico, 1942 ((1) pág. 1269), poder para fijar precios máximos a los artícu-

los de primera necesidad solamente cuando tales precios han subido o amenacen subir? O, según sostiene el Administrador, ¿tiene éste tal poder aun cuando dichos artículos no hayan subido de precio o amenacen subir, siempre y cuando que a su juicio la fijación de tales precios cumpla con los propósitos de la Ley núm. 228 según se expresan en su artículo 1, incluyendo la eliminación de ganancias excesivas?

El 17 de mayo de 1948 el Administrador dictó la Orden Administrativa núm. 175 enmendando la Orden núm. 174 del 13 de mayo de 1948 fijando en varias clasificaciones los precios máximos a que se podía vender el azúcar refinada en Puerto Rico. Prescribía la orden que se expedía a virtud de los poderes conferidos al Administrador a tenor con el artículo 3(a) (c) (e) de la Ley núm. 228. De acuerdo con el artículo 11, todas las entidades que refinan azúcar en Puerto Rico radicaron una moción de reconsideración, la cual fué declarada sin lugar. Luego las refinerías radicaron una querella ante el Tribunal de Apelación de Suministros de conformidad con el artículo 12(a) solicitando la revocación de dicha Orden. Dicho Tribunal dictó sentencia desestimando la querella. A tenor con el artículo 12(d), expedimos el auto de *certiorari* a solicitud de las refinerías con el fin de revisar la decisión del Tribunal de Apelación de Suministros. [1]

---

[1] Este caso exige que examinemos ciertas disposiciones de la Ley núm. 228. Artículo 1: ''Por la presente se declaran como los propósitos de esta Ley, la estabilización de precios; la prevención del alza especulativa, injustificada y anormal de precios; la eliminación y prevención de beneficios excesivos, el acaparamiento, la manipulación, la especulación y otras prácticas destructivas resultantes de las anormales condiciones del mercado y la escasez causada por la Emergencia Nacional; la seguridad de que las asignaciones para la Defensa no sean disipadas por los precios exorbitantes; la protección y sostenimiento de las normas de vida de personas cuyos ingresos sean limitados; la prevención de desajustes económicos que serían el resultado de los aumentos anormales en los precios; la consecución de una producción adecuada de productos de primera necesidad; la prevención del colapso de valores en el período de la post-guerra; la compra, obtención, almacenamiento, disposición y reglamentación de productos de primera necesidad para beneficio del pueblo, el abaratamiento en todo lo posible del coste de productos de primera necesidad para los habitantes de Puerto Rico; y el estímulo y desarrollo de nuevas fuentes de trabajo.''

 El primer error señalado es que de acuerdo con el artículo 3(a) el Administrador tiene poder para fijar precios máximos a un artículo de primera necesidad solamente cuando su precio haya subido o amenace subir; el precio del azúcar refinada, lejos de haber subido o de amenazar subir, constantemente iba bajando desde 1947 al 17 de mayo de 1948; por consiguiente, el Administrador carecía de autoridad en dicha fecha para dictar la Orden fijando precios máximos para el azúcar refinada.

Primeramente es necesario determinar sobre qué base actuó el Administrador. El artículo 12(a) dispone que si se radica ante el Tribunal de Apelación de Suministros una petición, el Administrador certificará y radicará ante dicha corte una transcripción de los procedimientos, que "incluirá una exposición, en cuanto sea posible, de los datos económicos y de otros hechos de que el Administrador haya tomado conocimiento oficial." El Administrador radicó tal "Exposición" ante la corte inferior, que en parte dice como sigue:

"Con anterioridad y hasta el 22 de abril de 1948, las cinco refinerías de Puerto Rico estaban vendiendo uniformemente el azúcar refinado en Puerto Rico a un precio de $8 el quintal, precio al por mayor, producto entregado, con descuento de 1½ por ciento por concepto de pago dentro de los 10 días. Este precio resultaba

Artículo 2(c): "El Administrador podrá, de tiempo en tiempo, dictar aquellas reglas y órdenes que crea necesarias para poner en vigor las disposiciones de esta Ley."

Artículo 3(a): "Cuando en el criterio del Administrador el precio o precios de artículos de primera necesidad (según éstos queden determinados por orden pública del Administrador, y para determinar los cuales queda el Administrador por la presente autorizado), hayan subido o amenacen subir en una forma inconsistente con los propósitos de esta Ley, dicho Administrador podrá, mediante reglas u órdenes, establecer aquellos precios máximos o beneficios máximos que en su criterio sean generalmente justos y equitativos y que ponga en vigor los propósitos de esta Ley; . . .' "

Artículo 3(b): "Cualquier regla u orden emitida de acuerdo con este artículo, podrá ser establecida en tal forma y manera que contenga aquellas clasificaciones y distinciones y provea para tales ajustes o razonables excepciones como sean necesarias y propias, en el criterio del Administrador, para poner en efecto los propósitos de esta Ley. Cualquier regla u orden emitida

excesivo y gravoso, tanto para el consumidor puertorriqueño, que venía pagando al detall entre 9½¢ y 10¢ por libra de azúcar refinado, envasado a granel, mientras que en los Estados Unidos Continentales el consumidor lo podía comprar a 9¢ la libra, no obstante ser el azúcar allí un producto de importación; y resultaba igualmente oneroso para nuestros industriales, que podían comprar azúcar refinado de Puerto Rico en el Continente a $7.40 o menos por las cien libras, dándose el caso, anómalo por completo, de que los industriales de Puerto Rico hubiesen podido comprar azúcar refinado en los Estados Unidos en condiciones más ventajosas que aquí, no obstante producirse el azúcar aquí y tener que ser llevado al Continente en donde tiene, además del costo original, los gastos adicionales de exportación.

"Siendo estos hechos comprobados y de conocimiento del Administrador, y habiendo sido recibidas. por éste quejas de consumidores domésticos, de consumidores industriales y de comerciantes, procedía por parte de éste la acción pertinente pára remediar este mal, y en cumplimiento de las disposiciones de ley, que se considera obligado a cumplir, al considerar que las refinerías de Puerto Rico apelantes hacían un beneficio excesivo para provecho exclusivo sobre la venta de su azúcar y sin que ese beneficio se revirtiera a los productores o colonos y que ello era contrario al interés público y a los propósitos de la Ley de Suministros, determinó conveniente y necesario fijar precios máximos para la venta de azúcar refinado en Puerto Rico."

El Administrador entonces copia el artículo 1 de la Ley núm. 228, en el cual se exponen los propósitos de la Ley, y

---

bajo este artículo, que establezca precios máximos, podrá disponer un precio máximo que sea menor que el precio o precios prevalecientes para el artículo de primera necesidad envuelto, al tiempo de la emisión de dicha regla u orden."

Artículo 3(c): "Cuando en el criterio del Administrador sea necesario y propio para poner en efecto los propósitos de esta Ley, podrá reglamentar mediante regla u orden, y podrá prohibir, prácticas especulativas o de manipulación, incluyendo prácticas relativas a cambios en la forma o calidad de un artículo, o el acaparamiento de algún artículo de primera necesidad que, en su criterio, equivalgan o propenden al alza de los precios inconsistentes con los propósitos de esta Ley."

Artículo 3(d): "Cuando el Administrador determine que la producción y posibles existencias de productos de primera necesidad no ofrezcan garantías de estabilidad, suficiencia o precios razonables en armonía con la necesidad y el poder adquisitivo del pueblo, o en alguna forma existan dudas en el criterio del Administrador en cuanto a dichos extremos, o cuando en el criterio del Administrador tal acción fuere necesaria para poner en vigor el fin

manifiesta que ''Para poder llevar a cabo los propósitos de esta Ley, la misma da al Administrador facultades discrecionales y amplios poderes, algunos de los cuales creemos pertinente transcribir para la mejor comprensión del caso.'' Entonces la ''Exposición'' transcribe los artículos 2(c), 3(a) (b) (c) (d) y 9(a). El Administrador dice entonces lo siguiente:

''En cumplimiento de los propósitos de esta Ley y haciendo uso de sus facultades discrecionales y poderes y obligación implícita, el Administrador creyó necesario fijar precios máximos para la venta de azúcar refinado al encontrar que los precios a que se venía vendiendo este producto en el mercado local no guardaban relación con los precios del mismo artículo en el mercado regulador; por considerar que dichos precios implicaban beneficios excesivos que debían ser eliminados porque contribuían a encarecer el costo de vida, con mayor razón cuando estos beneficios no eran redistribuídos entre colonos y productores en el interés público y de la economía del país en general; por considerar que los precios que prevalecían determinaban prácticas especulativas y eran enteramente contrarios a los principales propósitos de la Ley, los cuales son el abaratamiento en todo lo posible del coste de productos de primera necesidad para los habitantes de Puerto Rico y el estímulo y desarrollo de nuevas fuentes de trabajo.

''Es de conocimiento general el interés del Gobierno de Puerto Rico en desarrollar sus industrias, y es obvio que es contrario a

de abaratamiento del coste de productos de primera necesidad que persigue esta Ley, o alguno otro de sus fines, tendrá el Administrador la facultad de comprar, almacenar, transportar y disponer de dichos artículos de primera necesidad a nombre del gobierno de Puerto Rico y sin necesidad de recurrir a subastas públicas, a los precios que él estime que cumplen las finalidades de esta Ley; ...''

Artículo 3(e): ''Las órdenes, reglas y reglamentos dictados bajo esta Ley podrán contener todas aquellas disposiciones que el Administrador crea necesarias para evitar la evasión de los mismos.''

Artículo 9(a): ''El Administrador está autorizado para realizar aquellos estudios o investigaciones y para obtener aquella información que crea necesaria y propia para ayudarlo en el establecimiento de cualquier regla y orden bajo esta Ley, o en la administración y cumplimiento de la misma y las reglas, órdenes y escalas de precios que bajo ella se aprobaren.''

Las enmiendas de los anteriores artículos contenidas en la Ley núm. 493, Leyes de Puerto Rico, 1946 ((1) pág. 1475) y la Ley núm. 17 de diciembre 31 de 1946 ((2) pág. 125), Leyes de Puerto Rico, Segunda y Tercera Sesiones Extraordinarias, 1946, nada tienen que ver con este caso.

ese propósito y desarrollo de nuevas fuentes de trabajo que un grupo de industriales determinados, por tendencias especulativas o por querer derivar beneficios excesivos, impidan el desarrollo de nuevas fuentes de trabajo y el de industrias subsidiarias de su producto por tales medios.''

Luego el Administrador cita una vez más el artículo 3(a), y continúa su ''Exposición'':

''Los apelantes, en la Vista Pública celebrada el día 23 de junio de 1948, basaron su contención en la letra de este artículo, alegando que el azúcar no había subido, ni amenazaba subir, en una forma inconsistente y que por el contrario había bajado y que por tal razón el Administrador no tenía derecho a fijar precios máximos en este caso para la venta de azúcar refinado en Puerto Rico.

''Disentimos del criterio e interpretación de los apelantes. Ya hemos expuesto las razones que tuvo el Administrador para actuar y fijar precios máximos y que basó sus actuaciones y decisiones en los propósitos de la Ley, pero no ha de silenciar, además, su interpretación del referido artículo 3, que entiende debe hacerse de acuerdo con el espíritu y propósito de la Ley en sí y no basado estrictamente en su forma literal.

''El hecho de que un artículo de primera necesidad no suba o amenace subir en forma inconsistente no determina precisamente que el Administrador no pueda tomar acción de fijar precios a dicho artículo, si el precio que tiene el mismo, aunque no suba o amenace subir, no guarda la relación económica que debe guardar con otros factores económicos concurrentes, o si, en el criterio del Administrador, el precio prevaleciente, aunque no suba o amenace subir, en una forma inconsistente, no es razonable y tiende a encarecer indebidamente el costo de vida y a evitar el desarrollo de nuevas industrias y nuevas fuentes de trabajo; no precisamente por haber subido o amenazado subir sino por no haber bajado en relación con el mercado regulador, con el costo de la materia prima o con el costo de elaboración, y tener así un precio estático, fuera de lo que debe ser, por virtud de acuerdo o decisión de industrial o grupo de industriales; o por prácticas especulativas; o con el propósito de derivar beneficios excesivos, todo lo cual da el mismo resultado negativo que si el precio del artículo subiera o amenazara subir en forma inconsistente siendo por lo tanto el resultado contrario a los propósito de la Ley, y en su consecuencia ésta de justa aplicación. El Administrador, en sus facultades discrecionales, estima que

el Artículo 3 antes mencionado debe ser interpretado en un espíritu más amplio que el literal y que esa interpretación debe cumplir con los propósitos de la Ley.

"
. . . . . . . . . .

"Ya hemos dicho que hasta el 22 de abril las refinerías estaban vendiendo azúcar al precio de $8.00 por quintal y es de notar, y ello debe interpretarse como una plena justificación de la intervención del Administrador, que si hasta esa fecha las refinerías tenían establecido tal precio de $8 por quintal, inmediatamente desde esa fecha, de voluntad propia y como consecuencia de la intervención del Administrador, bajaron casi automáticamente el precio de venta a $7.75 en lugar de $8 que prevalecía . . . ."(2)

La actuación del Administrador queda aclarada por este extenso extracto de su "Exposición", exigida por el artículo 12(a). Puede sintetizarse como sigue: Es cierto que el único artículo que específicamente le confiere autoridad para fijar precios máximos propiamente dichos es el 3(a), que dispone que los puede fijar si los precios han subido o amenazan subir. Pero el artículo 3(a) no es la única fuente de su autoridad para fijar precios máximos. El artículo 1 expone varios propósitos de la Ley, incluyendo la eliminación de ganancias excesivas. Aun en ausencia de una conclusión al efecto de que los precios han subido o amenazan subir, el Administrador puede fijar precios máximos para cumplir con estos propósitos, especialmente para eliminar ganancias excesivas, en virtud de las disposiciones generales de los artículos 2(c), 3(a) (b) (c) (d) (e) y 9(a).

La dificultad con esta teoría del Administrador estriba en que no está de acuerdo ni con el lenguaje de la Ley núm. 228 ni con la jurisprudencia. El que la Legislatura exponga en el artículo 1 los propósitos de la Ley, incluyendo la eliminación de ganancias excesivas, es una cosa. Pero dicha disposición *in vacuo* no le confiere autoridad como tal al Administrador para fijar precios máximos o hacer cualquier

---

(2) El resto de la exposición se dedica mayormente a una relación detallada de los datos e informes sobre los cuales afirma el Administrador basó los precios máximos fijados por él al azúcar refinada.

otra cosa. Por el contrario, cuando hay que determinar qué poderes le han sido conferidos al Administrador, debemos referirnos a otros artículos de la Ley que enumeran sus diversos poderes. Y cuando la Legislatura llegó a la cuestión de fijar precios máximos, cuidadosamente condicionó el poder según éste aparece del artículo 3(a), a la conclusión previa de que los precios hayan subido o amenacen subir.

Tampoco puede argüirse que los otros artículos, fuera del 3(a), en que descansa el Administrador le confieren el poder que reclama para sí en este caso. Con excepción del artículo 3(d) que le confiere un poder específico que no es pertinente aquí, los artículos en que descansa el Administrador—artículos 2(c), 3(b) (c) (e), 9(a)—son meramente las disposiciones usuales que confieren autoridad al Administrador para tomar todos los pasos incidentales necesarios para implementar los poderes específicos conferídosle en otros artículos. Pero decir que dichos artículos confieren ilimitado poder al Administrador para fijar precios máximos que a su juicio dan cumplimiento a los propósitos de la Ley, equivaldría a hacer caso omiso de los claros y expresos términos del artículo 3(a) que restringe el ejercicio del poder para fijar precios máximos a aquellos casos en que los precios hayan subido o amenacen subir. Véase *De Jesús* v. *Caribbean Trucking Co.,* ante, página 555.

Los artículos de la Ley 228, envueltos en este caso, incluyendo el 3(a), fueron copiados casi al pie de la letra de la Ley Federal de Emergencia Sobre Control de Precios de 1942. Los casos que han interpretado el artículo federal que equivale al 3(a) nuestro, apoyan la misma conclusión a que hemos llegado nosotros en cuanto al alcance de los poderes del Administrador para fijar precios máximos. Tanto el Administrador como el Tribunal de Apelación de Suministros citan los casos de *Philadelphia Coke Co.* v. *Bowles,* 139 F.2d 349 (Emerg. Ct. of Apps. 1943) y *Seabord Oil Co.* v. *Bowles,* 149 F. 2d 661 (Emerg. Ct. of Apps., 1945) en apoyo de sus

conclusiones al efecto de que el Administrador tiene autoridad por nuestra Ley para fijar precios máximos a un artículo de primera necesidad aun en ausencia de una conclusión de que el precio de dicho artículo ha subido o amenaza subir. Pero creemos que dichos casos constituyen jurisprudencia para exactamente el resultado contrario.

En 1942 el Administrador Federal expidió un Reglamento General Sobre Precios Máximos mediante el cual los precios de los artículos de primera necesidad generalmente fueron congelados a los precios más altos cobrados por los vendedores durante el mes de marzo de 1942. Los querellantes en los dos casos arriba citados atacaron este Reglamento en tanto en cuanto el mismo era aplicable a gas de coque por el fundamento de que el precio del mismo no había subido y no amenazaba subir. La Corte de Apelaciones de Emergencia, que tenía jurisdicción exclusiva en tales casos, resolvió que el Administrador tenía autoridad para promulgar un reglamento general fijando precios máximos para todos los artículos, si llegaba a la conclusión de que había una amenaza general de aumentos inflacionarios en la economía, sin necesidad de que se llegara a una conclusión en el caso individual de cada artículo al efecto de que el precio de éste había subido o amenazaba subir. La corte caracterizó el artículo federal equivalente al 3(*a*) nuestro a la pág. 352 de 139 F.2d como "una autorización específica al Administrador para establecer precios máximos mediante un solo reglamento *cuando los precios de los artículos generalmente han subido o amenazan subir a un punto indebido.* De la historia legislativa de la ley surge que fué la intención del Congreso que esta autoridad se ejercitara mediante la imposición de un precio máximo general, en caso de que se concluyera que éste era necesario." (Bastardillas nuestras.)

La Corte resolvió en esos dos casos que para justificar un reglamento *general* de precios, no es necesario que el Administrador resuelva que *todo* artículo ha subido o amenaza

subir. Bajo estas circunstancias, es suficiente con que se cumplan los requisitos del artículo 3(a) si el Administrador resuelve que existe un movimiento general inflacionario en el cual sustancialmente todos los artículos han subido o amenazan subir, sin que concluya expresamente que el artículo específico vendido por el vendedor-querellante ha subido o amenaza subir. Y dijo la Corte en 139 F.2d pág. 353 que a tal conclusión se había llegado en el caso ante ella, toda vez que el preámbulo del Reglamento General Sobre Precios Máximos decía que "A juicio del Administrador de Precios los precios de los artículos y servicios generalmente han subido y amenazan con seguir subiendo a tal extremo y en tal forma inconsistente con los propósitos de la Ley de Emergencia Sobre Control de Precios de 1942."

De la resolución y lenguaje de esos casos surge claramente que si el Administrador desea expedir un reglamento general sobre precios máximos, no puede hacerlo sin concluir primeramente que los precios en general han subido o amenazan subir. Y de igual modo si el Administrador desea por el contrario, como ocurre en este caso, fijar el precio máximo de determinado artículo, debe a tenor con el mandato expreso del artículo 3(a) primeramente concluir que el precio de ese artículo en particular ha subido o amenaza subir.

El que los dos casos anteriores apoyen la proposición de que el Administrador debe mirar al artículo 3(a)—y no al artículo 1 que expone los propósitos de la Ley—como la fuente de su autoridad para fijar precios máximos, surge con meridiana claridad del caso de *Madison Park Corporation* v. *Bowles,* 140 F.2d 316 (Emerg. Ct. Apps., 1943). En dicho caso la Corte dijo a las págs. 319-20: "Este artículo [art. 1] trata exclusivamente de los propósitos de la Ley, no teniendo referencia alguna a la forma por la cual el Administrador de Precios cumplirá con tales propósitos. Es en el artículo 2, 50 USCA, Apéndice, artículo 902 [nuestro art. 3] en que se enumeran las condiciones bajo las cuales el Administrador de-

berá actuar. El inciso 2(a) [nuestro art. 3(a) trata de los artículos de primera necesidad y dispone que 'cuando en el criterio del Arministrador de Precios...el precio o precios de un artículo o de artículos de primera necesidad hayan subido o amenacen subir en una forma inconsistente con los propósitos de esta Ley,...dicho Administrador podrá... establecer aquel precio o precios máximos que en su criterio sean generalmente justos y equitativos y que ponga en vigor los propósitos de esta Ley.' " (Corchetes nuestros.)

En ninguno de los casos hay la más leve insinuación de que el Administrador Federal tenía poder para fijar precios máximos con el fin de dar cumplimiento a los propósitos de la Ley según se hace constar en el artículo 1 sin antes llegar a la conclusión de que los precios de los artículos envueltos habían subido o amenazaban subir. Tampoco el Administrador Federal reclamó jamás ese poder. Por el contrario, toda orden federal fijando precios que ha sido traída a nuestra atención, incluyendo el Reglamento General Sobre Precios Máximos, cuidadosamente decía que el Administrador Federal había llegado a la conclusión de que los precios de los artículos envueltos habían subido o amenazaban subir. Véanse *Hawaii Brewing Corporation* v. *Bowles,* 148 F.2d 846, 847 (Emerg. Ct. Apps. 1945); *Great Northern Co–Op Ass'n* v. *Bowles,* 146 F.2d 269, 272 (Emerg. Ct. Apps., 1944).

Finalmente, si bien no se levantó la cuestión en *Yakus* v. *United States,* 321 U. S. 414, la Corte Suprema sí indicó que el Administrador está facultado para fijar precios a los artículos (pág. 420) "cuando, en su criterio, sus precios 'hayan subido o amenacen subir en una forma inconsistente con los propósitos de esta Ley.' " Véanse también *Yakus* v. *United States,* supra, pág. 426; *Bowles* v. *Willingham,* 321 U.S. 503, 514; Ginsburg, *The Emergency Price Control Act of 1942: Basic Authority and Sanctions,* 9 *Law and Contemporary Problems* 22, 26–27; 12 Geo. Wash. L. Rev. 414; 28 Va. L. Rev. 991, 993–94.

Conforme indica la "Exposición" del Administrador, éste no concluyó que los precios del azúcar refinada habían subido o amenazaban subir. En verdad, el testimonio incontrovertido ofrecido por las refinerías fué (1) que tales precios habían bajado consistentemente desde el 31 de diciembre de 1947, cuando la orden federal fijando el precio en $8.20 dejó de regir; ([3]) y (2) que se estaba vendiendo el azúcar a $7.75 el 13 de mayo de 1948, fecha de la Orden Administrativa núm. 174. Sin embargo, el Administrador insistió en que la Ley núm. 228 le daba autoridad para fijar precios máximos al azúcar refinada en cumplimiento de los propósitos expuestos en el artículo 1 y reiterados en su "Exposición". Toda vez que el artículo 3(a) claramente dispone y los casos federales resuelven que una orden fijando precios máximos para un artículo debe estar predicada en la conclusión de que el precio del mismo ha subido o amenaza subir, la Orden Administrativa núm. 175 fijando precios máximos al azúcar refinada en Puerto Rico era inválida y debe dejarse sin efecto. ([4])

Este caso desde luego no envuelve la validez de órdenes del Administrador fijando precios máximos a *otros* artículos cuyos precios habían subido o amenazaban subir. Tampoco nos concierne el poder de la Legislatura para enmendar la Ley núm. 228 con el fin de autorizar al Administrador a

([3]) Esta prueba era errónea en un pequeño detalle. Los precios máximos federales para el azúcar terminaron el 31 de octubre de 1947. 61 Stat. 35; 1947 *Annual Survey of American Law*, págs. 256, 450.

([4]) El Tribunal de Apelación de Suministros resolvió que el Administrador no tenía que concluir que los precios han subido o amenazan subir como un requisito previo a la expedición de una orden fijando los precios. Pero también indicó que la reducción del precio de $8 a $7.75 después de que el Administrador había anunciado que se proponía fijar precios máximos al azúcar refinada demostró que los precios del azúcar refinada habían subido o amenazaban subir. No estamos de acuerdo. A lo sumo, esto demostró que el precio anterior era excesivo o que la competencia había obligado la rebaja, no que había subido. La manifestación de que una reducción en el precio constituye una amenaza de aumento, es un *non sequitur*. De cualquier modo, como hemos visto, el Administrador no concluyó que el precio había subido o amenazaba subir y no basó en esta conclusión su orden fijando los precios máximos.

fijar precios máximos con miras a eliminar ganancias excesivas o para cumplir los otros propósitos contenidos en el artículo 1. Sólo resolvemos que en 1942, al copiar la Ley Federal de Emergencia Sobre Control de Precios, nuestra Legislatura siguió el modelo de la Ley Federal, y optó en el artículo 3(a) por limitar el poder del Administrador para fijar precios máximos a los artículos a aquellos casos donde los precios de éstos han subido o amenazan subir. Mientras el artículo 3(a) permanezca sin enmendar, no puede subsistir una orden como la del presente caso que no está apoyada por tal conclusión.

En vista del resultado a que hemos llegado, es innecesario considerar los otros errores señalados por las refinerías.

*Por los motivos expuestos, se revocará la Orden Administrativa núm. 175 del Administrador General de Suministros fijando los precios máximos al azúcar refinada en Puerto Rico.*

El Juez Asociado Sr. Negrón Fernández se·inhibió.